IN THE UNITED DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**F I L E D**

APR 1 6 2008

MICHAEL W DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | Docket Number: |
| | ) | |
| v. | ) | Civ. No. 58-C-1159 |
| | ) | |
| True Temper Corporation; | ) | |
| Wilson Athletic Goods Mfg. Co., Inc.; | ) | |
| A.G. Spalding & Bros., Inc.; | ) | |
| MacGregor Sport Products, Inc.; and | ) | |
| Hillerich & Bradsby Co., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF TRUE TEMPER SPORTS, INC.
## IN SUPPORT OF MOTION TO VACATE FINAL DECREES

True Temper Sports, Inc. ("True Temper") submits this memorandum in support of its

Motion To Vacate The Final Decrees in the above-captioned matters, specifically the consent

decrees entered by the United States District Court for the Northern District of Illinois in U.S. v.

True Temper Corporation, Civil Action No. 58-C-1158 (the "1959 Decree") against True Temper

only, and in U.S. v. True Temper Corporation; Wilson Athletic Goods Mfg. Co., Inc.; A.G.

Spalding & Brothers. Inc.; MacGregor Sport Products. Inc.; and Hillerich & Bradsby Co., Civil

Action No. 58-C-1159 (the "1961 Decree") (collectively "the Decrees"). The other defendants

and Russell Corporation support termination of the 1961 Decree.[1]

The Decrees relate to True Temper's marketing of golf club shafts and the other

defendants' marketing of golf clubs. The United States has agreed tentatively to vacating the

---

[1] The factual background in this memorandum is based principally on the attached Declaration of Scott C. Hennessy, President and Chief Executive Officer of True Temper (Hennessy Decl.). With respect to A.G. Spalding & Bros., there have been numerous changes in the structure and ownership of that company since the entry of the 1961 Decree, including a name change to the Top Flite Golf Co. and a bankruptcy filing in 2003. The right to use the Spalding brand name on golf clubs and certain other sports equipment is currently owned by Russell Corporation. Currently there are no Spalding golf clubs sold in the United States. To the extent the 1961 Decree could be deemed to apply to Russell Corporation's use of the Spalding brand name on golf clubs, this motion is supported by Russell Corporation.

1

Decrees, but as a matter of policy does not consent to vacating the Decrees without public notice and an opportunity for public comments.[2]

## I.    INTRODUCTION.

True Temper is a successor to defendant True Temper Corporation and is headquartered in Memphis, Tennessee.[3] True Temper designs, manufactures and distributes steel and graphite golf club shafts for sale principally to domestic and international golf club companies. Its sales were $108 million in 2006, a decline from 2005 sales of $117.6 million. The company reported a loss of $10.8 million for 2006 and a loss of $0.5 million for 2005. The company's branded shafts include True Temper and Grafalloy shafts. True Temper shafts can also be purchased as components through retail stores and mail order from golf product distributors. Since the time of the Decrees, True Temper's share of shaft sales has declined from approximately 90% to 34%. Hennessy Decl. ¶ 16. Due to competition in the market for golf shafts, True Temper has diversified into the manufacturing of bicycle components and graphite hockey sticks. At the time the 1961 Decree was entered, the other defendants accounted for approximately 80% of golf clubs sold in the United States. Today their share is less than 10% and as discussed, Spalding golf clubs are no longer sold in the United States. Hennessy Decl. ¶ 15.

The 1959 Decree severed True Temper's relationships with certain foreign shaft producers and prohibited price fixing, market allocation, and imposed limitations on the export and import of golf shafts. The 1961 Decree concerned True Temper's relationships with, and marketing of golf clubs by, the four leading golf club manufacturers of the day, also known as the Big Four: Wilson Athletic Goods Mfg. Co., Inc., A.G. Spalding & Bros., Inc., MacGregor

---

[2]  Both Decrees provide that the Court retains jurisdiction over these Decrees.

[3]  Defendant True Temper Corporation merged into Allegheny Ludlum Corporation ("Allegheny") in 1967. In 1985, Allegheny sold True Temper Corporation to Emhart Corporation, which was itself acquired by the Black & Decker Corporation ("Black & Decker") in April of 1989. Until recently, True Temper Sports was a division of a wholly owned subsidiary of Black & Decker. In 1998, True Temper acquired Grafalloy, a manufacturer of graphite shafts. Cornerstone Equity Investors, LLC acquired a controlling interest in True Temper on September 28, 1998. On March 15, 2004, Gilbert Global Equity Partners, LLP acquired a controlling interest in True Temper. Hennessy Decl. ¶ 2.

Sport Products, Inc. and Hillerich & Bradsby Co. The 1961 Decree prohibited the defendants from, inter alia, abiding by the terms of certain contracts in place at the time; fixing the sale or resale prices of any shafts or clubs; suggesting resale prices (True Temper only); agreeing to restrict the sale of shafts or clubs; discriminating in price, discounts or allowances in connection with the sale of shafts, except as permitted by United States laws relating to price discrimination (True Temper only); agreeing to allocate customers; allowing any employee, director, or stockholder of the Big Four to be employed by another club manufacturer or True Temper; and with respect to the Big Four only, disseminating price lists prior to such lists being published and holding membership in any trade association whose activities would violate the Decree. The 1961 Decree also requires True Temper to sell standard shafts and special shafts under certain conditions to any other club manufacturer. The Decrees are perpetual. True Temper and the other defendants have complied with these Decrees since they were entered.

The golf club shaft industry and the golf club industry have changed dramatically in the approximately fifty years since the Decrees were entered. In its original complaints, the Government alleged that by 1957, True Temper accounted for approximately 90% of the dollar volume of all sales of steel shafts produced and sold in the United States and had only one competitor and that at that time, "[v]irtually all golf clubs [then] produced throughout the world [were] made with steel shafts." Complaint at ¶ 10. Today, graphite shafts now account for approximately 40% of the worldwide golf shaft market by units sold, and approximately 60% by dollar volume. Hennessy Decl. ¶ 6. True Temper's market share of all shafts sold worldwide is approximately 34% by dollar volume. Hennessy Decl. ¶ 16. Moreover, there are numerous competing shaft producers both in the United States and throughout the world. Hennessy Decl. ¶¶ 16-22.

The Decrees prevent True Temper from instituting distributor and retailer pricing programs that have resulted in increased consumer exposure and acceptance of competing brands and increased use of competing shaft brands as standard shafts by leading club manufacturers. In recent years, major club manufacturers such as Callaway and TaylorMade have begun using

3

branded graphite shafts as their standard or stock shafts in their clubs, with the shaft prominently displaying the shaft manufacturer's name and logo. Most sales of shafts are to club manufacturers for use in their clubs. Significantly, True Temper graphite shafts are not used as standard shafts by major club manufacturers. In fact, True Temper graphite shafts are used as standard shafts by only a second tier club manufacturer in some of its clubs. Hennessy Decl. ¶ 8

The entire golf club manufacturing industry has also undergone major changes over the past few decades. Most significant has been the enormous growth in the number of competing golf club makers with substantial market shares. According to the Government's original allegations, the former Big Four club makers accounted for approximately 80% of all clubs sold in the United States in 1956. They currently account for less than 10%. Moreover, none of the former Big Four remains among the top four in club sales. Hennessy Decl. ¶ 15.

## II.    GOLF SHAFT AND GOLF CLUB INDUSTRIES.

### A.    Golf Shaft Industry

Golf club shafts are primarily steel or graphite, or a combination of steel and graphite, although other materials such as titanium or aluminum may be used. At the time of the Decrees, graphite golf shafts did not exist. Today, graphite shafts account for approximately 40% of the worldwide shaft market by units sold, and approximately 60% by dollar volume. Hennessy Decl. ¶ 6. The vast majority of golf shafts are sold to manufacturers for production of golf clubs sold at retail.

The shaft is critical to the performance and marketing of golf clubs because it controls the consistency and distance of a golf shot. Because shafts are a major cost component of the total material cost of a golf club and because of the intense competition in the golf club market, club manufacturers are extremely price sensitive to shaft prices. Hennessy Decl. ¶ 6.

Steel and graphite shafts are functional equivalents, and can be interchanged. Many styles of clubs are available with either steel or graphite shafts. Hennessy Decl. ¶ 7. Due to variations in quality, there are graphite and steel shafted golf clubs available at all prices. The

4

competition between steel and graphite shafts is demonstrated by the fact that club manufacturers offer the same clubs with a choice of steel or graphite shafts. <u>Golf Monthly,</u> a leading golf magazine, publishes detailed directories listing the make and model of a golf club and the type of shaft offered. In many cases steel and graphite shafts are offered. However, in some cases only graphite shafts are offered, showing how graphite has replaced steel shafts since the original Decrees.

Sales of shafts are directly affected by a club manufacturer's selection and/or promotion of a particular shaft. Club manufacturers offer the same clubs with shafts manufactured by a variety of different golf shaft companies. Hennessy Decl. ¶ 8. For example, Callaway offers consumers the choice of graphite shafts manufactured by the following companies for its 2008 Big Bertha Fairway Woods club: Aldila, Fujikura, Grafalloy (True Temper), and UST. Callaway also offers its graphite "house brand" shafts, which are manufactured by a number of shaft companies, including many Asian "non-branded" manufacturers. Only one steel shaft is offered, which is a house brand as well.

Today's major golf shaft producers include Aldila, Fujikura, Nippon, UST, FEMCO, Graphite Design, Mitsubishi Rayon, Summit Sports and Sunwoo (which provides a large portion of Callaway's private label shafts). All of these companies compete with True Temper, either in steel or in graphite. There are also numerous smaller shaft producers worldwide. It is estimated that there are approximately fifty graphite shaft manufacturers worldwide, with very few having any production in North America and the majority located in Far East Asia. In order to stay competitive with foreign manufacturers, True Temper has recently moved most of its domestic graphite shaft production to mainland China. Hennessy Decl. ¶ 17.

There has also been significant expansion in recent years by shaft competitors:

- Aldila, a manufacturer of graphite shafts, has recently doubled its share of all shaft sales to 20.7%.
- Nippon Shaft Co., a Japanese manufacturer, has expanded its production of steel shafts and has gained an estimated 7.6% of all shaft sales.

- Fujikura, a Japanese manufacturer of graphite shafts, has increased its estimated share of shaft sales from 5.0% in 2002 to 7.0% in 2005.
- Mitsubishi Rayon has recently significantly expanded its sales of graphite shafts and its current share of graphite sales approximates True Temper's.
- Graphite Design has entered into production of graphite shafts in the U.S. and has an estimated current market share of 3.7% of all shaft sales.
- FEMCO, a Taiwan manufacturer, has also expanded its production of steel shafts.
- Summit Sports has started up a steel shaft manufacturing facility in China to take advantage of lower production costs there and is currently marketing steel shafts under the Apollo brand name. Hennessy Decl. ¶ 18.

Due to the increasing demand for graphite shafts at the expense of steel, True Temper estimates that its 2005 worldwide market share of shafts, including steel and graphite, is approximately 34% of dollar volume. Its share of steel sales is approximately 68% and its share of graphite sales is approximately 12%.[4] Attached to the Hennessy Declaration is a market share chart based on True Temper's estimates of the 2005 dollar sales of shaft manufacturers. (The "Other" category consists of Mitsubishi Rayon and also includes other graphite shaft manufacturers with shares of 1% or less.)[5]

Aldila is currently the leading graphite shaft company in the world, with an estimated 31% share of graphite shaft sales, compared to a 12% share for True Temper.[6] Like Fujikura and Mitsubishi, Aldila has instituted minimum price and advertising programs that have created distributor and retailer support and consumer acceptance of Aldila shafts as high quality premium shafts. Hennessy Decl. ¶ 19. True Temper is prevented by the Decrees from offering

---

[4] In the steel segment, True Temper has benefited from its introduction of new lighter-weight steel shafts designed to be more competitive with graphite shafts and from the recent exit of Apollo Sports, a United Kingdom competitor, and Royal Precision, a U.S. competitor. However, Summit Sports is now marketing Apollo brand steel shafts manufactured at its new start-up facility in China, where production costs are lower. Hennessy Decl. ¶ 16.

[5] The wide availability of shafts manufactured by a variety of different companies is also shown by the number of different brands of shafts sold by leading distributors and retailers. Golfsmith, a leading distributor and retailer of golf equipment and merchandise, offers the following brands of golf club shafts: Accuflex, Aldila, Fujikura, Golfsmith, Grafalloy (True Temper), Graphite Design, Harrison Sports, Harvey Penick, Killer Bee, Paragon, Penley, Snake Eyes, True Temper, UST, XPC and Zebra. Similarly, The GolfWorks, another leading distributor and on-line retailer, offers the following brands of shafts: Fujikura, Accuflex, Aldila, UST, Grafalloy (True Temper), CER, Harrison, Hero, Distance Master, FiberSteel, Harmon, ASD, Rapport, Graphite Design, Penley, True Temper, Maltby and Apollo. Hennessy Decl. ¶ 10.

[6] Aldila's net sales increased from $53 million in 2004 to $77 million in 2005 and $72 million in 2006. Its net income also increased from $9.8 million in 2004 to $19.9 million in 2005 and $13.5 million in 2006. Aldila, Inc. 2006 Annual Report at 2. By contrast, True Temper has experienced net losses during the same period.

6

such programs. According to Aldila, it "believes it is the largest supplier of graphite shafts to the United States club market which results from its ability to establish a premium brand image and reputation among golf club companies as a value-added supplier with competitive prices." Aldila, Inc. Form 10-K FYE Dec. 31, 2006, at 8. Aldila also states that Aldila was the most popular shaft brand in new drivers, fairway woods and hybrid clubs, that its branded shaft usage has more than doubled in the last two years and that it remains the largest graphite shaft company in the world in sales and units. Aldila, Inc. 2006 Annual Report at 4.

Fujikura is a leading Japanese manufacturer of graphite shafts. Its sales of graphite shafts have increased significantly in recent years and its share and sales of graphite shafts exceed True Temper's, with Fujikura currently having an estimated 18% to 20% share of graphite sales compared to 12% for True Temper. Hennessy Decl. ¶ 20. Fujikura has utilized minimum advertised price programs and minimum price programs to develop distributor and retailer support and establish its brand as a high quality premium shaft. This has resulted in major club manufacturers actively promoting and featuring Fujikura shafts as their standard shafts. For example, TaylorMade, one of the leading club manufacturers in the world and part of the Adidas group, actively promotes Fujikura shafts in its clubs as an important feature, including for its r7™ and Burner™ line of drivers. Among the important features promoted by TaylorMade are the Fujikura standard shafts in its clubs: "TaylorMade RE*AX 65 shaft by Fujikura reduces ovaling in the mid-section and promotes stability, consistency and increased club head speed." Hennessy Decl. ¶ 20.

Mitsubishi Rayon is part of the Mitsubishi group of companies and reported 2006 annual worldwide sales of $3 billion. Mitsubishi Rayon has recently achieved a 10% share of graphite shaft sales by implementing programs that promote distributor and retailer support and result in consumer acceptance of this brand as a high quality premium product. Leading club manufacturers have been featuring Mitsubishi Diamana™ shafts as standard shafts in their clubs due to the high quality premium image that these distributor and retailer programs have created. Hennessy Decl. ¶ 20.

True Temper, like other shaft manufacturers, has responded to the competition between steel and graphite shafts by introducing new products, including combination steel and graphite products and innovative lighter-weight steel shafts. True Temper was the first to introduce a commercially viable multi-material golf shaft combining both steel and graphite into one shaft. Hennessy Decl. ¶ 12.

True Temper offers a much greater selection of models and product lines than it did 40 years ago. True Temper's golf shaft products include over 1,000 proprietary or special models (with customers' brand name, label or trademark affixed to the shaft) and 2,000 branded models (with the True Temper and/or Grafalloy brand name, label or trademark affixed to the shaft). True Temper designs, manufactures and markets approximately 275 lines of steel shafts and approximately 75 lines of premium graphite shafts. In addition to steel or graphite shafts, consumers today can select shafts based on a much larger set of factors, including flex, torque, weight, bendpoint, balance point, type of tip (including parallel, tapered or unitized shaft), length, composition, price and appearance. Hennessy Decl. ¶¶ 13-14.

**B.    Golf Club Industry**

In the mid 1970's, the market share of the co-defendant golf club manufacturers began to decline due to a number of competitive market factors. A new, cost-effective casting process developed to compete with the capital equipment-intensive forging of club heads; Ping was the first to employ this technology. In the mid-1980's, oversized club heads such as Callaway's "Big Bertha" were introduced and rapidly increased market share. In the late 1980's, graphite shafted clubs became a popular alternative to steel. Hennessy Decl. ¶ 11.

At the time of the Final Decrees, the Big Four were the four top golf club manufacturers, with a collective share of approximately 80% of all golf club sales in the United States. By 1997, the top four golf club manufacturers were Callaway, Cobra, TaylorMade and Karsten (Ping). In 1997, the four defendant golf club manufacturers had a collective market share of less

than 10%. True Temper estimates that this collective market share is substantially less than 10% today. Hennessy Decl. ¶ 15.

Another significant change in the market for golf clubs and golf shafts is globalization of marketing, production, and outsourcing. Competition has intensified due to the outsourcing of golf club manufacturing to foreign companies. These companies manufacture shafts and heads and assemble clubs for branded U.S. club companies. For example, Advance International Multitech Co., a company located in Taiwan and mainland China, began as a golf club head manufacturer and now manufactures shafts and assembles golf clubs for companies such as TaylorMade, Callaway and Nike. Fusheng Industrial Co. of Taiwan also manufactures graphite shafts and assembles complete clubs in China for U.S. club companies. Hennessy Decl. ¶ 22.

## III.    NEED FOR TERMINATION.

The golf shaft and golf club markets have undergone significant changes since the entry of the Decrees. The Decrees address market conditions which no longer exist. There is significant foreign competition for steel and graphite shafts and consumers are able to choose from a wide variety of brands of steel and graphite shafts. The provisions in the Decrees restrict defendants' ability to respond to foreign and domestic competition and also could be interpreted as restricting defendants' ability to protect their trade secrets, know how, trademarks and trade dress.

In seeking to increase its small 12% share of the graphite segment, True Temper is bound by provisions which predate the introduction of graphite shafts. The intense competition provided by graphite shafts is demonstrated by a recent Golfsmith catalogue, which devotes 38 pages to graphite shafts from a variety of different manufacturers and only 11 pages to steel shafts. Hennessy Decl. ¶ 24.

### A.    The 1959 Decree

The 1959 Decree resolved the Government's allegations regarding True Temper's relationships with certain foreign shaft producers. It prohibited True Temper from entering into,

adhering to, maintaining or enforcing any contract, agreement or understanding with any other person, the purpose or effect of which is, or may be, to:

   (A)   Allocate or divide territories, markets or customers for the manufacture, sale or distribution of steel shafts;

   (B)   Restrict or limit imports into or exports from the United States of steel shafts (except by the exercise of lawful patent or trademark rights);

   (C)   Fix prices, terms or conditions for the sale of steel shafts to or by any third person.

1959 Decree at Paragraph VI. To the extent that this language prohibits certain horizontal arrangements, it duplicates existing law which prohibits such conduct per se. By its terms, however, this prohibition is not limited to horizontal arrangements. It may also preclude certain vertical arrangements that today are judged under the rule of reason because they can promote interbrand competition, which is "the primary concern of the antitrust law." Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 52 (1977). Such arrangements are most likely procompetitive in today's market. See ABA Section of Antitrust Law, Antitrust Law Developments (6th ed. 2007) at 148-50.[7] Significantly, the Supreme Court has recently ruled that even vertical price fixing is judged by the rule of reason because such restraints can promote interbrand competition and competition in general. Leegin Creative Leather Products, Inc. v. PSKS, Inc., 127 S. Ct. 2705 (2007).

### B.    The 1961 Decree

The 1961 Decree resulted from the Government's allegations that True Temper conspired with the former Big Four club makers of the 1950's to monopolize the golf shaft and golf club industries in the United States. Many of the provisions are simply unnecessary as redundant statements of existing law. The remainder are either broad prohibitions on conduct that today

---

[7] The 1959 Decree also required True Temper to divest interests in and otherwise to sever contractual ties with certain British and Australian companies involved in the manufacture and sale of golf club shafts. 1959 Decree at Paragraph IV and VIII. True Temper did so in 1960, within the prescribed seven-month period. The Decree, however, continues to prohibit True Temper from acquiring any interest in those companies or their successors. While True Temper has no plans to make such acquisitions, this prohibition is no longer warranted. There simply is no realistic danger of monopolization through such an acquisition.

would be examined under the rule of reason, or they are prophylactic requirements that are no longer warranted or potentially anticompetitive.

The 1961 Decree applies not only to True Temper's sales of steel shafts, but also to its sales of graphite shafts as well.[8] Thus, the Decree impairs True Temper's ability to compete on an equal basis in a segment of the shaft market that did not even exist in 1961, but which now represents more than 60% of the entire shaft market by dollar volume.

Also among the 1961 Decree's numerous restrictions are prohibitions on suggested retail prices (Paragraph VI(A)(3)) and on requirements contracts between True Temper and the co-defendant club manufacturers (Paragraph V). The law, however, does not prohibit a manufacturer suggesting retail prices, and the practice is widespread. See ABA Section of Antitrust Law, Antitrust Law Developments (6th ed. 2007) at 137-41. Likewise, requirements contracts are not illegal per se, and the potentially procompetitive effects of such arrangements are well recognized. Id. at 210-21. Given the original defendants' very small or non-existent shares in today's highly competitive golf club market, it would be virtually impossible for a requirements contract between True Temper and any one of the former Big Four club makers to have anticompetitive effects.

Paragraphs VI(A)(1), (2) and (3) of the 1961 Decree restrict True Temper's ability to respond to competition from other manufacturers of steel and graphite shafts. True Temper is unable to encourage distributor and retailer support for its graphite and steel shafts by suggesting resale prices, offering minimum advertised price promotions, and establishing exclusive territories. Paragraph IV(A) of the 1961 Decree also prohibits agreements that establish the terms and conditions for the sale or resale of graphite or steel shafts to third persons, thus restricting True Temper from establishing exclusive territories.

The law on per se illegality of resale restrictions has changed substantially as a result of GTE Sylvania and Leegin. Under GTE Sylvania and Leegin, the effect a non-price and price

---

[8]  The Decree applies to all golf shafts, "whether made of steel or other material."  1961 Decree at Paragraph II(E)(1).

restraint has upon competition in the marketplace is analyzed under the rule of reason. In applying the rule of reason to vertical non-price restrictions on competition, the GTE Sylvania Court underscored the efficiency-creating potential of those arrangements. Today, it is recognized that vertical arrangements can foster efficiency by reducing free rider problems and promoting interbrand competition, which is the primary concern of the antitrust laws. Leegin; Antitrust Law Developments at 148-50.

Counterfeiting, "knockoffs" and theft of intellectual property have become a significant problem in the golf club industry, and it is estimated that as much as $200 million is spent annually by U.S. consumers on counterfeit golf clubs.[9] True Temper is currently investigating instances of suspected counterfeiting of its golf club shafts. Hennessy Decl. ¶ 27.

Paragraph VI(A)(2) and VII(B) of the 1961 Decree could be interpreted as preventing defendants from taking any action against persons who manufacture, sell or purchase counterfeit shafts or clubs or who have misappropriated defendants' trade secrets, know how, trademarks or trade dress. Similar provisions are contained in the 1959 Decree. See Paragraphs VII and VI(B).

Due to the intense competition among shaft manufacturers, True Temper has sought more cost-competitive supply sources and moved most of its graphite shaft manufacturing to mainland China, like many other manufacturers. Because of the Decrees, True Temper is currently restricted in its ability to obtain cost-competitive graphite shafts from third parties. True Temper would like to contract with a manufacturer of graphite shafts in Taiwan that can supply graphite shafts at more competitive prices. Hennessy Decl. ¶ 28. However, the 1961 Decree prohibits True Temper from entering into any agreement or understanding with any entity that restricts sales of shafts to third persons, including agreement with a cost-competitive source of

---

[9]  Mitsubishi Rayon has just issued a counterfeit product warning for its shafts and a U.S. Golf Manufacturers Anti-Counterfeiting Working Group has been formed to combat counterfeiting. Hennessy Decl. ¶ 27.

supply of graphite shafts.[10] Because True Temper would be disclosing its proprietary designs, know-how and technology to this manufacturer, True Temper would require restrictions on the ability of this manufacturer to sell shafts using True Temper's know-how to third parties without authorization from True Temper. This could be regarded as a violation of the Decrees and for this reason, True Temper has delayed contracting with more cost-competitive sources of supply. Hennessy Decl. ¶ 28.

"Special shafts" - those with unique and often proprietary specifications - account for approximately 26% of True Temper's shaft net sales, and account for a significant portion of the entire shaft market. These proprietary shafts are custom designed and frequently co-branded in partnership with customers to accommodate specific golf club head designs. True Temper currently produces special shafts for at least two of the former Big Four club manufacturers. Hennessy Decl. ¶ 30. According to the 1961 Decree, if at any time True Temper manufactures or sells special shafts for or to three or more of the defendant club manufacturers, then it must also manufacture special shafts for any other club manufacturer in the U.S. upon submission of a minimum order of 15,000 special shafts. Given the number of competitors in the market this "duty to deal" provision is not warranted.[11]

The prevalent practice of providing shafts specially designed to match customers' club heads demonstrates an industry-wide competitive effort to differentiate brands in a highly

---

[10] For example, paragraph IV(C) of the 1961 Decree prohibits True Temper from, directly or indirectly, entering into, adhering to, maintaining, enforcing or attempting to enforce, any contract, agreement, understanding, plan, or program with any other person "[t]o refrain from manufacturing, distributing, or selling any particular kind, type, grade or style of shaft or golf club, or golf clubs embodying any particular kind, type, grade, or style of shaft." Similarly, paragraph VI(A)(2) of the 1961 Decree prohibits True Temper from "[h]indering, restricting, limiting or preventing, or attempting to hinder, restrict, limit or prevent any other person from (a) manufacturing or selling any shaft or golf clubs for or to any third person or class of persons, or (b) purchasing any shaft or golf club from any manufacturer thereof."

[11] Moreover, as discussed above, True Temper is facing significant foreign competition from companies which manufacture steel and graphite shafts and also assemble clubs for golf club companies. Certain provisions of the Decrees could restrict True Temper's ability to respond competitively by offering its own club assembly. For example, Paragraph IV of the 1961 Decree states that a defendant is prohibited from entering into any agreement to refrain from manufacturing or selling any particular kind, type, grade or style of golf club, thus arguably requiring True Temper to manufacture or sell golf clubs assembled for one company to other companies. Similarly, Paragraph VII(C) of the 1961 Decree could be interpreted in the same manner. Hennessy Decl. ¶ 23.

competitive marketplace. True Temper should be allowed the same freedom to compete and market special shafts that its competitors enjoy.[12]

## IV.    LEGAL STANDARDS APPLICABLE TO VACATE AN ANTITRUST CONSENT DECREE.

This Court has jurisdiction to modify or vacate the Decrees pursuant to Paragraph X of the 1959 Decree, Paragraph XII of the 1961 Decree, Rule 60(b)(5) of the Federal Rules of Civil Procedure, and "principles inherent in the jurisdiction of the chancery." United States v. Swift & Co., 286 U.S. 106, 114 (1932). Where, as here, the United States tentatively has consented to a proposed vacating of the Decrees and it is no longer equitable for the Decrees to have prospective application, the issue before the Court is whether vacating is in the public interest. United States v. International Business Machines Corp., 163 F.3d 737 (2d Cir. 1998).[13]

The Court should approve a consensual decree termination where the United States has provided a reasonable explanation to support the conclusion that termination is consistent with the public interest. Loew's, 783 F. Supp. at 214. See also Western Elec. II at 933 F.2d 1576-77 (under "deferential" public interest test, court should accept a consensual termination of decree restrictions that Department of Justice "reasonably regarded as advancing the public interest;" it is "not up to the court to reject an agreed-on change simply because the proposal diverge[s] from its view of the public interest;" rather, court "may reject an uncontested modification only if it has exceptional confidence that adverse antitrust consequences will result").

---

[12]  Paragraph VI(C) of the 1961 Decree provides that True Temper's petition to the Court to be relieved of the requirement to provide special shafts shall be granted if the requirement is no longer necessary or appropriate and "substantial and effective competition exists in the manufacture and sale of special shafts." Effective and substantial competition clearly exists in the manufacture and sale of all shafts, including special shafts. The requirement to provide special shafts, therefore, is neither necessary nor appropriate in today's market.

[13]  See also United States v. Western Elec. Co., 993 F. 2d 1572, 1576 (D.C. Cir. 1993) ("Western Elec. II"); United States v. Western Elec. Co., 900 F. 2d 283, 305 (D.C. Cir. 1990) ("Western Elec. I"); United States v. Loew's, Inc., 783 F. Supp. 211, 213 (S.D.N.Y. 1992); United States v. Columbia Artists Management, Inc., 662 F. Supp. 865, 869-70 (S.D.N.Y. 1987).

V.    **VACATING IS APPROPRIATE BECAUSE THE BASIC PURPOSES OF THE DECREES HAVE BEEN ACHIEVED AND ANTITRUST LAW AND THE GOLF SHAFT AND GOLF CLUB MARKETS HAVE CHANGED SIGNIFICANTLY.**

Under United States v. United Shoe Machinery Corp., 391 U.S. 244, 248 (1968), vacating an antitrust consent decree is appropriate where the defendants demonstrate that the basic purposes of the decree have been achieved.[14]  In this case, vacating the consent decree is justified both because the basic purposes of the Decrees have been achieved and because the antitrust law and competition in the golf shaft and golf club markets have changed significantly.  Vacating the Decrees will enhance competition.  Under these circumstances, prospective application of the Decrees is no longer equitable and they should be vacated.

Respectfully submitted,

Robert E. Hauberg, Jr.
John G. Calender
Phillip C. Zane, Illinois Bar No. 6208254
Baker Donelson, Bearman, Caldwell & Berkowitz, P.C.
555 Eleventh Street, N.W., Sixth Floor
Washington, D.C. 20004

Attorneys for True Temper Sports, Inc.

---

[14]  The Second Circuit in United States v. Eastman Kodak Co., 63 F.3d 95, 102 (2d Cir. 1995), also recognized that significant changes in the factual or legal climate may justify a consent decree termination even where the United Shoe standard for judgment terminations has not been satisfied.

# EXHIBIT A

### IN THE UNITED DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | Docket Numbers: |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civ. No. 58-C-1158 |
| | ) | |
| True Temper Corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 58-C-1159 |
| | ) | |
| True Temper Corporation; | ) | |
| Wilson Athletic Goods Mfg. Co., Inc.; | ) | |
| A.G. Spalding & Bros., Inc.; | ) | |
| MacGregor Sport Products, Inc.; and | ) | |
| Hillerich & Bradsby Co.; | ) | |
| | ) | |
| Defendants. | ) | |

### Declaration of Scott C. Hennessy

Scott C. Hennessy, being duly sworn, states as follows:

#### Background

1. I have been the President and Chief Executive Officer of True Temper Sports, Inc.,
   ("True Temper") since January of 1996. True Temper is a successor to True Temper
   Corporation and a wholly-owned subsidiary of True Temper Corporation. I have held a
   variety of executive and management positions since joining the company in August of
   1994 as a Vice President of Marketing. I was named Vice President of Sales and
   Marketing in 1995. Prior to that I had been with Black & Decker in numerous positions
   since 1980.

2. True Temper is headquartered in Memphis, Tennessee and designs, manufactures and
   distributes steel and graphite golf club shafts for sale to domestic and international golf

1

club companies. True Temper shafts can also be purchased as components through retail, mail order and from on-line golf product distributors. True Temper's sales were $108 million in 2006, a decline from 2005 sales of $117.6 million. The company reported a loss of $10.8 million for 2006 and a loss of $0.5 million for 2005. Due to competition in the market for golf shafts, True Temper has diversified into the manufacturing of bicycle components and graphite hockey sticks.

3.     Defendant True Temper Corporation merged into Allegheny Ludlum Corporation ("Allegheny") in 1967. In 1985, Allegheny sold True Temper Corporation to Emhart Corporation, which was itself acquired by the Black & Decker Corporation ("Black & Decker") in April of 1989. Until recently, True Temper Sports was a division of a wholly owned subsidiary of Black & Decker. In 1998, True Temper acquired Grafalloy, a manufacturer of graphite shafts. Cornerstone Equity Investors, LLC acquired a controlling interest in True Temper on September 28, 1998. On March 15, 2004, Gilbert Global Equity Partners, LLP acquired a controlling interest in True Temper.

## Final Decrees

4.     True Temper is bound by Final Decrees entered into by this Court in 1959 and 1961. The 1959 Decree severed True Temper's relationships with certain foreign shaft producers and prohibited price fixing, market allocation, and limitation of the export/import of golf shafts. The 1961 Decree concerned True Temper's relationships with the four leading golf club manufacturers of the day: Wilson, Spalding, MacGregor, and Hillerich & Bradsby. These companies were prohibited from coercing fixed resale prices; restricting the sale of clubs; agreeing to allocate customers; allowing any employee, director, or stockholder to be employed by both their companies and True Temper; disseminating price lists prior to such lists being published; and holding membership in any trade association whose activities would violate the Decree. The Final Decrees are perpetual. True Temper has complied with these Decrees since they were entered.

## Golf Club and Golf Shaft Industry

5.     A golf club has three major components: the club head, the shaft and the grip. Club manufacturers typically purchase shafts from suppliers and assemble them with compatible club heads and grips, factoring in design, weight and technology. Golf club shafts, like other components, are also sold through retailers and mail order houses for repair, replacement, and do-it-yourself club making. The vast majority of golf shafts are sold to manufacturers for production of golf clubs sold at retail.

6.     Golf club shafts are primarily steel or graphite, or a combination of steel and graphite, although other materials such as titanium or aluminum may be used. At the time of the Final Decrees, graphite golf shafts did not exist. Today, graphite shafts account for approximately 40% of the worldwide shaft market by units sold, and approximately 60% by dollar volume. The shaft is critical to the performance and marketing of golf clubs because it controls the consistency and distance of a golf shot. Because shafts are a major cost component of the total material cost of a golf club and because of the intense

2

competition in the golf club market, club manufacturers are extremely price sensitive to shaft prices.

7.     Steel and graphite shafts are functional equivalents, and can be interchanged. Many styles of clubs are available with either steel or graphite shafts. Graphite shafts are usually lighter in weight than steel shafts, but some are comparable. Due to variations in quality, there are graphite and steel shafted golf clubs available at all prices. The competition between steel and graphite shafts is demonstrated by the fact that club manufacturers offer the same clubs with a choice of steel or graphite shafts. <u>Golf Monthly</u>, a leading golf magazine, publishes detailed directories listing the make and model of a golf club and the type of shaft offered. In many cases both steel and graphite shafts are offered. However, in some cases only graphite shafts are offered, showing how graphite has replaced steel shafts since the dates of the original Decrees.

8.     The Decrees prevent True Temper from instituting distributor and retailer pricing programs that have resulted in increased consumer exposure and acceptance of competing brands and increased use of competing shaft brands as standard shafts by leading club manufacturers. In recent years, major club manufacturers such as Callaway and TaylorMade have begun using branded graphite shafts as their standard or stock shafts in their clubs, with the shaft prominently displaying the shaft manufacturer's name and logo. Most sales of shafts are to club manufacturers for use in their clubs. Significantly, True Temper graphite shafts are not used as standard shafts by major club manufacturers. In fact, True Temper graphite shafts are used as standard shafts by only a second tier club manufacturer in some of its clubs.

9.     Sales of shafts are directly affected by a club manufacturer's selection and/or promotion of a particular shaft. Club manufacturers offer the same clubs with shafts manufactured by a variety of different golf shaft companies. For example, Callaway offers consumers the choice of graphite shafts manufactured by the following companies for its 2008 Big Bertha Fairway Woods club: Aldila, Fujikura, Grafalloy (True Temper), and UST. Callaway also offers its graphite "house brand" shafts, which are manufactured by a number of shaft companies, including many Asian "non-branded" manufacturers. Only one steel shaft is offered, which is a "house brand" shaft as well.

10.    The wide availability of shafts manufactured by a variety of different companies is also shown by the large number of different brands of shafts sold by leading distributors and retailers. Golfsmith, a leading distributor and retailer of golf equipment and merchandise, offers the following brands of golf club shafts in a recent catalogue: Accuflex, Aldila, Fujikura, Golfsmith, Grafalloy (True Temper), Graphite Design, Harrison Sports, Harvey Penick, Killer Bee, Paragon, Penley, Snake Eyes, True Temper, UST, XPC and Zebra. Similarly, The GolfWorks, another leading distributor and on-line retailer, offers the following brands of shafts: Fujikura, Accuflex, Aldila, UST, Grafalloy (True Temper), CER, Harrison, Hero, Distance Master, FiberSteel, Harmon, ASD, Rapport, Graphite Design, Penley, True Temper, Maltby and Apollo.

11.    In the mid 1970's, the market share of the co-defendant golf club manufacturers began to decline due to a number of competitive market factors. At that time, new market entrants

began changing the technology of golf clubs and building a demand for innovation. A new, cost-effective casting process was developed to compete with the capital equipment-intensive forging of club heads; Ping was the first to employ this technology. In the mid-1980's, oversized club heads such as Callaway's "Big Bertha" were introduced and rapidly earned market share. In the late 1980's, graphite shafted clubs became a popular alternative to steel. Now, demand for graphite shafts from all club manufacturers rivals that of steel.

12.    True Temper, like other shaft manufacturers, has responded to the competition between steel and graphite shafts by introducing new products, including combination steel and graphite products and innovative lighter-weight steel shafts. True Temper was the first to introduce a commercially viable multi-material golf shaft combining both steel and graphite into one shaft. Other new products introduced by True Temper and Grafalloy include:

- Grafalloy ProLogic, designed for use in irons as a graphite alternative to steel;

- New steel shafts with polymer inserts that have the vibration damping characteristics of graphite shafts together with the consistent performance and distance control qualities of steel shafts;

- True Temper's TX-90 product, which is a superlight steel product targeted at current graphite iron shaft users searching for the consistency of steel and players seeking a lighter alternative to traditional steel shafts.

13.    True Temper offers a much greater selection of models and product lines than it did 45 to 50 years ago. True Temper's golf shaft products include over 1,000 proprietary or special models (with customers' brand name, label or trademark affixed to the shaft) and 2,000 branded models (with the True Temper and/or Grafalloy brand name, label or trademark affixed to the shaft). True Temper designs, manufactures and markets approximately 275 lines of steel shafts and approximately 75 lines of premium graphite shafts.

14.    Golf club shafts vary considerably based on a large number of different factors, including flex, torque, weight, bendpoint, balance point, type of tip (including parallel, tapered or unitized shaft), length, composition, price and appearance.

15.    Over the past 50 years, the golf club and golf shaft markets have changed substantially. At the time of the Final Decrees, the four top golf club manufacturers were Wilson, Spalding, MacGregor, and Hillerich & Bradsby, with a collective share of approximately 80% of all golf club sales in the United States. At that time, True Temper accounted for approximately 90% of the dollar volume of all sales of steel shafts produced and sold in the United States and few other types of shafts were available. By 1997, the top four golf club manufacturers were Callaway, Cobra, TaylorMade and Karsten (Ping). In 1997, the four defendant golf club manufacturers had a collective market share of less than 10% and True Temper estimates that this collective market share is substantially less than 10% today. Another significant change in the market for golf clubs and golf shafts is globalization of marketing, production, and outsourcing. Approximately 36% of True

Temper's 2006 net sales were international sales. Moreover, while True Temper had only one manufacturing facility 50 years ago, located in Geneva, Ohio, it currently has a domestic manufacturing facility and a manufacturing facility in China for golf club shafts.

16.     Due to the increasing demand for graphite shafts at the expense of steel, True Temper estimates that its 2005 worldwide market share of shafts, including steel and graphite, is approximately 34% of dollar volume. Its share of steel sales is approximately 68% and its share of graphite sales is approximately 12%. In the steel segment, True Temper has benefited from its introduction of new lighter-weight steel shafts designed to be more competitive with graphite shafts and from the recent exit of Apollo Sports, a United Kingdom competitor, and Royal Precision, a US competitor. However, Summit Sports is now marketing Apollo brand steel shafts manufactured at its new start-up facility in China, where production costs are lower. Attached are market share charts based on True Temper's estimates of the 2005 dollar sales of shaft manufacturers. (The "Other" category consists of Mitsubishi Rayon and also includes other graphite shaft manufacturers with shares of 1% or less.)

## Golf Shaft Competition

17.     Today's major golf shaft producers include Aldila, Fujikura, Nippon, UST, FEMCO, Graphite Design, Mitsubishi Rayon, Summit Sports and Sunwoo (which provides a large portion of Callaway's private label shafts). All of these companies compete with True Temper, either in steel or in graphite. Mitsubishi has recently significantly expanded its sales of graphite shafts and it is estimated that Mitsubishi's current share of graphite sales approximates True Temper's share. Tiger Woods is using Mitsubishi's Diamana shafts on his golf clubs. There are also numerous smaller shaft producers worldwide. We estimate that there are approximately fifty graphite shaft manufacturers worldwide, with very few having any production in North America and the majority located in Far East Asia. In order to stay competitive with foreign manufacturers, True Temper has recently moved most of its domestic graphite shaft production to mainland China.

18.     There has also been significant expansion in recent years by shaft competitors:

- Aldila, a manufacturer of graphite shafts, has recently doubled its share of all shaft sales to an estimated 20.7%.

- Nippon Shaft Co., a Japanese manufacturer, has expanded its production of steel shafts and has gained an estimated 7.6% of all shaft sales.

- Fujikura, a Japanese manufacturer of graphite shafts, has increased its estimated share of shaft sales from 5.0% in 2002 to 7.0% in 2005.

- Graphite Design has entered into production of graphite shafts in the U.S. and has an estimated current market share of 3.7% of all shaft sales.

- FEMCO, a Taiwan manufacturer, has also expanded its production of steel shafts.

5

- Summit Sports has started up a steel shaft manufacturing facility in China to take advantage of lower production costs there and is currently marketing steel shafts under the Apollo brand name.

19. Aldila is currently the leading graphite shaft company in the world, with an estimated 31% share of graphite shaft sales, compared to a 12% share for True Temper.[1] Like Fujikura and Mitsubishi, Aldila has instituted minimum price and advertising programs that have created distributor and retailer support and consumer acceptance of Aldila shafts as high quality premium shafts. True Temper is prevented by the Decrees from offering such programs. According to Aldila, it "believes it is the largest supplier of graphite shafts to the United States club market which results from its ability to establish a premium brand image and reputation among golf club companies as a value-added supplier with competitive prices." Aldila, Inc. Form 10-K FYE Dec. 31, 2006, at 8. Aldila also states that Aldila was the most popular shaft brand in new drivers, fairway woods and hybrid clubs, that its branded shaft usage has more than doubled in the last two years and that it remains the largest graphite shaft company in the world in sales and units. Aldila, Inc. 2006 Annual Report at 4.

20. Fujikura is a leading Japanese manufacturer of graphite shafts. Its sales of graphite shafts have increased significantly in recent years and its share and sales of graphite shafts exceed True Temper's, with Fujikura currently having an estimated 18% to 20% share of graphite sales compared to 12% for True Temper. Fujikura has utilized minimum advertised price programs and minimum price programs to develop distributor and retailer support and establish its brand as a high quality premium shaft. This has resulted in major club manufacturers actively promoting and featuring Fujikura shafts as their standard shafts. For example, TaylorMade, one of the leading club manufacturers in the world and part of the Adidas group, actively promotes Fujikura shafts in its clubs as an important feature, including for its r7™ and Burner™ line of drivers. Among the important features promoted by TaylorMade are the Fujikura standard shafts in its clubs: "TaylorMade RE*AX 65 shaft by Fujikura reduces ovaling in the mid-section and promotes stability, consistency and increased club head speed."

21. Mitsubishi Rayon is part of the Mitsubishi group of companies and reported 2006 annual worldwide sales of $3 billion. Mitsubishi Rayon has recently achieved a 10% share of graphite shaft sales by implementing programs that promote distributor and retailer support and result in consumer acceptance of this brand as a high quality premium product. Leading club manufacturers have been featuring Mitsubishi Diamana™ shafts as standard shafts in their clubs due to the high quality premium image that these distributor and retailer programs have created. Mitsubishi has also quickly achieved a prominent position on the PGA tour, highlighted by the use of its driver shafts by the number one player in the world, Tiger Woods.

---

[1] Aldila's net sales increased from $53 million in 2004 to $77 million in 2005 and $72 million in 2006. Its net income also increased from $9.8 million in 2004 to $19.9 million in 2005 and $13.5 million in 2006. Aldila, Inc. 2006 Annual Report at 2. By contrast, True Temper has experienced net losses during the same period.

22.   Competition has intensified due to the outsourcing of golf club manufacturing to foreign
      companies. These companies manufacture shafts and heads and assemble clubs for
      branded U.S. club companies. For example, Advance International Multitech Co., a
      company located in Taiwan and mainland China, began as a head manufacturer and now
      manufactures shafts and assembles golf clubs for companies such as TaylorMade,
      Callaway and Nike. Fusheng Industrial Co. of Taiwan also manufactures graphite shafts
      and assembles complete clubs in China for U.S. club companies. Another example of
      outsourcing of club assembly to foreign competition and replacement of steel by graphite
      shafts also made by foreign competition is provided by a recently purchased Jack
      Nicklaus Golden Bear Tour 16-Piece Complete Golf Set. This set previously consisted of
      all steel shafts, but as the attached photos from the carton show, the shafts are now 100%
      proprietary graphite shafts and the entire set is labeled "Made in China." True Temper
      did not manufacture either the steel or graphite shafts used in these clubs and is not
      involved in the assembly of these clubs.

## Need for Termination

23.   The golf shaft and golf club markets have undergone significant changes since the entry
      of the Final Decrees. The Final Decrees address market conditions which no longer exist
      today. The markets for golf shafts and golf clubs are much more competitive today, with
      significant foreign competition for steel and graphite shafts and with consumers able to
      choose from a wide variety of brands of steel and graphite shafts. The provisions in the
      Decrees restrict True Temper's ability to respond to foreign and domestic competition
      and also could be interpreted as restricting True Temper's ability to protect its trade
      secrets, know how, trade marks and trade dress.

24.   The Final Decrees restrict True Temper's ability to compete in the graphite segment of
      the market. The demand for steel shafts has declined considerably since the Decrees
      were entered, and the demand for graphite shafts has been growing worldwide. In
      seeking to increase its small share of the graphite segment, True Temper is bound by
      provisions which predate the introduction of graphite itself. The intense competition
      provided by graphite shafts is demonstrated by a recent Golfsmith catalogue, which
      devotes 38 pages to graphite shafts from a variety of different manufacturers and only 11
      pages to steel shafts.

25.   As discussed above, consumers today are able to choose from a much larger variety of
      types and brands of shafts for their golf clubs. They can select steel or graphite shafts,
      choose the manufacturer of the steel or graphite shafts, and even select the characteristics
      of a specific manufacturer's steel or graphite shaft, such as flex, torque, weight, flex point
      and balance point. The detailed golf club manufacturer directories from Golf Monthly
      magazine demonstrate that in many cases consumers can select between graphite and
      steel shafts for their clubs and can select the stiffness of the graphite or steel shafts.
      Callaway offers consumers the choice of graphite shafts manufactured by five different
      companies, plus Callaway "house brand" shafts, for its 2008 Big Bertha Fairway Woods
      club, and consumers can specify the model, flex, weight, torque and kick point for the
      graphite shaft selected.

7

26. Paragraphs VI(A)(1), (2) and (3) of the 1961 Decree restrict True Temper's ability to respond to competition from other manufacturers of steel and graphite shafts. True Temper is unable to encourage distributor and retailer support for its graphite and steel shafts by suggesting resale prices, offering minimum advertised price promotions, and establishing exclusive territories. Paragraph IV(A) of the 1961 Decree also prohibits agreements that establish the terms and conditions for the sale or resale of graphite or steel shafts to third persons, thus restricting True Temper from establishing exclusive territories. Paragraph VI(A) of the 1959 Decree contains a similar restriction for steel shafts.

27. Counterfeiting, "knockoffs" and theft of intellectual property have become a significant problem in the golf club industry. One recent article estimates that as much as $200 million is spent annually by U.S. consumers on counterfeit golf clubs. Mitsubishi has just issued a counterfeit product warning for its shafts and a U.S. Golf Manufacturers Anti-Counterfeit Working Group has been formed to combat counterfeiting. While there have been numerous raids and seizures by U.S. and foreign law enforcement agencies and private court actions, this illegal activity still continues. True Temper is currently investigating instances of suspected counterfeiting of its golf club shafts, but certain provisions of the Decrees could be interpreted as preventing True Temper from taking action against such illegal activity. For example, Paragraph VI(A)(2) of the 1961 Decree could be interpreted as preventing True Temper from taking any action against persons who manufacture, sell or purchase counterfeit True Temper graphite or steel shafts or who have misappropriated True Temper's trade secrets, know how, trademarks or trade dress. Similarly the 1959 Decree contains provisions which could be interpreted as preventing True Temper from taking action to restrict import or export of shafts that incorporate misappropriated know how or trade secrets of True Temper for steel shafts. See Paragraph VII. Paragraph VI(B) of the 1959 Decree also prohibits agreements that restrict or limit imports or exports of steel shafts, which could be interpreted as restricting True Temper from settling disputes with companies that have misappropriated True Temper's trade secrets, know how, trademarks or trade dress.

28. The 1961 Decree prohibits True Temper from entering into any agreement or understanding with any entity that restricts sales of shafts to third persons, including agreements with a cost-competitive source of supply of graphite shafts.[2] Because True Temper would be disclosing its proprietary designs, know-how and technology to this manufacturer, True Temper would require restrictions on the ability of this manufacturer to sell shafts using True Temper's know-how to third parties without authorization from True Temper. This could be regarded as a violation of the Consent Decrees and for this

---

[2] For example, paragraph IV(C) of the 1961 Decree prohibits True Temper from, directly or indirectly, entering into, adhering to, maintaining, enforcing or attempting to enforce, any contract, agreement, understanding, plan, or program with any other person "[t]o refrain from manufacturing, distributing, or selling any particular kind, type, grade or style of shaft or golf club, or golf clubs embodying any particular kind, type, grade, or style of shaft." Similarly, paragraph VI(A)(2) of the 1961 Decree prohibits True Temper from "[h]indering, restricting, limiting or preventing, or attempting to hinder, restrict, limit or prevent any other person from (a) manufacturing or selling any shaft or golf clubs for or to any third person or class of persons, or (b) purchasing any shaft or golf club from any manufacturer thereof."

8

reason, True Temper has delayed contracting with more cost-competitive sources of supply.

29. Moreover, as discussed above, True Temper is facing significant foreign competition from companies which manufacture steel and graphite shafts and also assemble clubs for golf club companies. Certain provisions of the Decrees could restrict True Temper's ability to respond competitively by offering its own club assembly. For example, Paragraph IV of the 1961 Decree states that a defendant is prohibited from entering into any agreement to refrain from manufacturing or selling any particular kind, type, grade or style of golf club, thus arguably requiring True Temper to manufacture or sell golf clubs assembled for one company to other companies. Similarly, Paragraph VII(C) of the 1961 Decree could be interpreted in the same manner.

30. "Special shafts" - those with unique and often proprietary specifications - account for approximately 26% of True Temper's shaft net sales, and account for a significant portion of the entire shaft market. These proprietary shafts are custom designed and frequently co-branded in partnership with customers to accommodate specific golf club head designs. Examples of proprietary models include co-branded products such as Callaway's Memphis 10, Nike's Speedstep, Ping's JZ and ZZ Lite and Wilson's Fat Shaft. True Temper currently produces special shafts for at least two of the four Defendant club manufacturers. According to the 1961 Decree, if at any time True Temper manufactures or sells special shafts for or to three or more of the defendant club manufacturers, then it must also manufacture special shafts for any other club manufacturer in the U.S. upon submission of a minimum order of 15,000 special shafts. Given the number of competitors in the market this "duty to deal" provision is not warranted.

31. The 1959 Decree prohibits True Temper from acquiring any interest in certain British or Australian companies or their successors. This prohibition is no longer necessary, as there is no realistic danger of monopolization or cartelization through acquisition.

32. True Temper has no current plans to acquire any interest in the aforementioned British or Australian companies or their successors.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on April 10 , 2008.

Scott C. Hennessy

**GOLF CLUB SHAFTS**

**2005 ESTIMATED GLOBAL SALES DATA (in thousands)[3]**

| MANUFACTURER | 2005 SALES | MARKET SHARE |
|---|---|---|
| True Temper | $111,300 | 33.8% |
| Aldila | $68,000 | 20.7% |
| Nippon | $25,000 | 7.6% |
| Fujikura | $23,000 | 7% |
| Royal Precision[4] | $12,600 | 3.8% |
| Graphite Design | $12,150 | 3.7% |
| UST | $11,250 | 3.4% |
| FEMCO | $2,500 | 0.8% |
| Summit Sports | $600 | 0.2% |
| Other[5] | $62,500 | 19% |
| TOTAL | $328,900 | 100.00% |

[3] This chart does not include the recent significant growth of Mitsubishi Rayon in graphite shaft sales.

[4] Royal Precision went out of business in June, 2006.

[5] This category consists of Mitsubishi Rayon and also includes other graphite shaft manufacturers with shares of 1% or less.

10

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| United States of America, | ) |
| | ) |
| Plaintiff, | ) |
| v. | )     Civ. No. 58-C-1159 |
| | ) |
| True Temper Corporation; | ) |
| Wilson Athletic Goods Mfg. Co., Inc.; | ) |
| A.G. Spalding & Bros., Inc.; | ) |
| MacGregor Sport Products, Inc.; and | ) |
| Hillerich & Bradsby Co., | ) |
| | ) |
| Defendants. | ) |

## PROPOSED ORDER

Upon consideration of the motion of Defendant True Temper Sports, Inc. to vacate the

final judgment entered in this action in 1961, and upon expiration of the period for notice and

comment, and the Plaintiff United States having consented to vacating the final judgment and not

having withdrawn its consent, and after a review of the relevant pleadings, and for good cause

shown, it is hereby

ORDERED that the final judgment entered in this action in 1961 be and hereby is

vacated and without further effect.

SO ORDERED.

Dated: _____

                                                 _____
                                                 United States District Judge

Tendered by:
Phillip C. Zane, Illinois Bar No. 6208254
Baker Donelson, Bearman, Caldwell & Berkowitz, P.C.
555 Eleventh Street, N.W., Sixth Floor
Washington, D.C. 20004
202-508-3400
Attorneys for True Temper Sports, Inc.

## CERTIFICATE OF SERVICE

I, Phillip C. Zane, an attorney and a member of the Bar of this Court, hereby certify that on this 15th day of April, 2008, I caused a true and correct copy of the True Temper Sports Inc.'s NOTICE OF MOTION, MOTION OF TRUE TEMPER SPORTS, INC. TO VACATE THE FINAL DECREES AFTER A PERIOD OF NOTICE AND PUBLIC COMMENT, MEMORANDUM OF TRUE TEMPER SPORTS, INC. IN SUPPORT OF THE MOTION TO VACATE FINAL DECREES, and PROPOSED ORDER, all to be docketed in CIV. NO. 58-C-1159, to be served on the following by US Mail, postage prepaid:

*for the United States:*
Frank Vondrak, Esq.
Rosemary S. Thompson, Esq.
Antitrust Division, United States Department of Justice
209 South LaSalle Street, Suite 600
Chicago, Illinois, 60604.

*for Wilson Athletic Goods Mfg. Co., Inc.:*
Ray Berens, Esq.
Andre Pabarue, Esq.
Amer Sports North America
8750 W. Bryn Mawr Ave.
Chicago IL 60631

*for Russell Corp.*
*(owner of certain marks once owned by A.G. Spalding & Bros., Inc.):*
Clay Humphries, Esq.
Russell Corp.
755 Lee Street
Alexander City, AL  35010

*for MacGregor Sport Products, Inc.:*
Michael Robbins
COO, MacGregor Golf
MacGregor Sport Products, Inc.
1000 Pecan Grove Dr.
Albany, GA  31710

*for Hillerich & Bradsby Co.:*
Steven H. Lyverse, Esq.
Hillerich & Bradsby Co., Inc.
800 West Main St.
Louisville, KY  40232-5700

Phillip C. Zane