IN THE UNITED DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **Docket Numbers:** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civ. No. 58-C-1158** |
| | ) | |
| TRUE TEMPER CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civ. No. 58-C-1159** |
| | ) | |
| TRUE TEMPER CORPORATION; | ) | |
| WILSON ATHLETIC GOODS MFG. CO., | ) | |
| INC.; A.G. SPALDING & BROS., INC.; | ) | |
| MACGREGOR SPORT PRODUCTS, INC. | ) | |
| AND HILLERICH & BRADSBY CO., | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OF THE UNITED STATES IN RESPONSE TO
TRUE TEMPER SPORTS, INC.'S UNCONTESTED MOTION TO TERMINATE
THE 1959 FINAL JUDGMENT AND THE 1961 FINAL JUDGMENT

Rosemary Simota Thompson
Attorney for the United States
U.S. Department of Justice
Antitrust Division
209 South LaSalle Street, Suite 600
Chicago, Illinois 60604
(312) 353-7530
(312) 353-1046 (facsimile)
rosemary.thompson@usdoj.gov

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................ ii

I.    INTRODUCTION ...................................................................................................... 1

II.   THE COMPLAINTS AND FINAL JUDGMENTS ........................................................... 2

    A.    The 1959 Final Judgment...................................................................................... 2

    B.    The 1961 Final Judgment...................................................................................... 3

    C.    Provisions of the Final Judgments that Remain in Force ........................................ 4

III.  LEGAL STANDARDS APPLICABLE TO TERMINATION OF AN ANTITRUST
    FINAL JUDGMENT WITH THE CONSENT OF THE UNITED STATES..................... 5

IV.   REASONS WHY THE UNITED STATES HAS TENTATIVELY CONSENTED
    TO TERMINATION OF THE 1959 FINAL JUDGMENT AND THE 1961
    FINAL  JUDGMENT ............................................................................................... 7

    A.    Changes in Antitrust Law and the Golf Club Industry Render the Final
        Judgments Unnecessary ...................................................................................... 9

    B.    Provisions of the Final Judgments Prohibit Potentially Procompetitive
        Conduct that Modern Antitrust Law Allows........................................................ 11

    C.    Conclusion ......................................................................................................... 13

V.    PROPOSED PROCEDURES FOR PROVIDING PUBLIC NOTICE OF THE
    PENDING MOTIONS AND INVITING COMMENT THEREON................................. 14

VI.   CONCLUSION........................................................................................................ 15

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977) .................................................. 12

*Leegin Creative Leather Products. v. PSKS, Inc.*, 127 S. Ct. 2705 (2007) ................................... 12

*Northern Pacific Railway Co. v. United States*, 356 U.S. 1 (1958) ................................................ 7

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993).............................................................. 6

*State Oil Co. v. Khan*, 522 U.S. 3 (1997).................................................................................... 12

*United States v. American Cyanamid Co.*, 719 F.2d 558 (2d Cir. 1983) ....................................... 6

*United States v. Columbia Artists Management, Inc.*, 662 F. Supp. 865 (S.D.N.Y. 1987) ....... 6, 8

*United States v. Eastman Kodak Co.*, 63 F.3d 95 (2d Cir. 1995)............................................... 2, 9

*United States v. International Business Machines Corp.*, 163 F.3d 737 (2d Cir. 1998) ........5, 6, 7

*United States v. Loew's Inc.*, 783 F. Supp. 211 (S.D.N.Y. 1992) .............................................. 6, 7

*United States v. Swift & Co.*, 286 U.S. 106 (1932) ....................................................................... 5

*United States v. Swift & Co.*, 1975-1 Trade Cas. (CCH) ¶ 60,201 (N.D. Ill. 1975)..................... 14

*United States v. True Temper Corp.*, 1959 Trade Cas. (CCH) ¶ 69,441 (N.D. Ill. 1959) .......... 1, 5

*United States v. True Temper Corp.*, 1961 Trade Cas. (CCH) ¶ 70,090 (N.D. Ill. 1961) .......... 1, 5

*United States v. True Temper Corp.*, No. 58-C-1158 (N.D. Ill. filed June 30, 1958) ................... 2

*United States v. True Temper Corp.*, No. 58-C-1159 (N.D. Ill. filed June 30, 1958) .................... 2

*United States v. United Shoe Machinery Corp.*, 391 U.S. 244 (1968)........................................... 9

*United States v. Western Electric Co.*, 900 F.2d 283 (D.C. Cir. 1990)......................................... 6

*United States v. Western Electric Co.*, 993 F.2d 1572 (D.C. Cir. 1993) ....................................... 6

### OTHER MATERIALS

*Antitrust Division Manual*, § IV.E.2 (1998 ed.)........................................................................... 8

Press Release, U.S. Department of Justice, Antitrust Division, *Department of Justice Announces New Protocol to Expedite Review Process for Terminating or Modifying Older Antitrust Decrees* (April 13, 1999) ........................................................................ 8

Antitrust Division and Office of Legal Counsel of the Department of Justice, concerning Department of Justice Authorization for Fiscal Year 1984: *Hearing Before the Subcomm. on Monopolies & Commercial Law of the H. Committee on the Judiciary*, 98th Cong. 95 (1983) (Testimony of William F. Baxter, Assistant Attorney General, U.S. Department of Justice) ............................................................................................. 8

The Honorable William French Smith, Attorney General of the United States, *Remarks at the Annual Meeting of the District of Columbia Bar* (June 24, 1981) ................................ 8

U.S. Department of Justice, Antitrust Division, DOJ Bulletin No. 1984-04, *Statement of Policy by the Antitrust Division Regarding Enforcement of Permanent Injunctions Entered in Government Antitrust Cases* ............................................................................ 8

Jeffrey I. Zuckerman, *Removing the Judicial Fetters: The Antitrust Division's Judgment Review Project* (1982) ....................................................................................................... 8

## I.   INTRODUCTION

True Temper Sports, Inc. ("True Temper"), successor in interest to defendant True Temper Corporation, has moved to terminate the Final Judgment in *United States v. True Temper Corp.*, 1959 Trade Cas. (CCH) ¶ 69,441 (N.D. Ill. 1959), entered by the Court on August 20, 1959 ("1959 Final Judgment"), and the Final Judgment in *United States v. True Temper Corp.*, 1961 Trade Cas. (CCH) ¶ 70,090 (N.D. Ill. 1961), entered by the Court on August 1, 1961 ("1961 Final Judgment").[1]  A copy of the 1959 Final Judgment is attached as Appendix 1, and a copy of the 1961 Final Judgment is attached as Appendix 2.

After conducting a thorough investigation, the United States tentatively consents to termination of both the 1959 Final Judgment and the 1961 Final Judgment, subject to such notice and comment as may be ordered by the Court.[2]  The United States has concluded that these judgments are no longer necessary to protect competition, that some of their provisions may well inhibit competition, and that the continued existence of these judgments does not otherwise provide any public benefit.  The judgments bar defendants from participating in arrangements that may be procompetitive and that defendants' competitors are free to undertake.  Therefore, it would be in the public interest for the Court to terminate both the 1959 Final Judgment and 1961 Final Judgment as to all defendants.

---

[1] Five defendants were subject to the 1961 Final Judgment: True Temper, Wilson Athletic Goods Manufacturing Company, Inc. ("Wilson"), A.G. Spalding & Brothers, Inc. ("Spalding"), MacGregor Sport Products, Inc. ("MacGregor") and Hillerich & Bradsby Company ("H&B"). True Temper was the sole defendant to the 1959 Final Judgment.  Since entry of the 1961 Final Judgment, Spalding has undergone numerous changes in its structure and ownership.  Russell Corporation ("Russell") now owns the right to use the Spalding brand name on golf clubs, although no Spalding golf clubs are being sold in the United States at this time.  True Temper notified Wilson, MacGregor, H&B and Russell of its intent to terminate the 1961 Final Judgment.  Wilson, MacGregor and H&B do not oppose termination.  To the extent the 1961 Final Judgment could be deemed to apply to Russell's use of the Spalding name on golf clubs, Russell does not oppose termination.

[2] The Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h) (the "Tunney Act"), which provides for public notice and comment on antitrust settlements proposed by the United States, does not apply to decree terminations.  Nevertheless, the United States solicits public comments in furtherance of its investigation of the proposed termination of antitrust decrees.

As discussed below, the judgments involve similar legal and factual issues, and the sole defendant to the 1959 Final Judgment is also a defendant to the 1961 Final Judgment. The parties submit that, in the interest of judicial economy, these motions should be addressed simultaneously. *See United States v. Eastman Kodak Co.*, 63 F.3d 95, 97-100 (2d Cir. 1995) (terminating separate decrees with one order).

## II.    THE COMPLAINTS AND FINAL JUDGMENTS

The 1959 Final Judgment and 1961 Final Judgment arose out of an investigation in the 1950s into anticompetitive practices by the original five defendants and certain foreign companies, including foreign companies in which defendant True Temper held an ownership interest. The core competitive concern of the United States involved two horizontal conspiracies: (a) one among True Temper, the manufacturer of the vast majority of all golf club shafts used at that time, and certain other steel shaft manufacturers; and (b) one among True Temper and four golf club manufacturers (collectively, "the four manufacturer defendants"), which accounted for the vast majority of all clubs sold in the United States at the time, with each group of defendants allegedly assisting the other in monopolizing its respective market. As a result of this investigation the United States filed two complaints on June 30, 1958: *United States v. True Temper Corp.*, No. 58-C-1158 (N.D. Ill. filed June 30, 1958) (attached as Appendix 3) and *United States v. True Temper Corp.*, No. 58-C-1159 (N.D. Ill. filed June 30, 1958) (attached as Appendix 4).

### A.    The 1959 Final Judgment

The United States filed one complaint against sole defendant True Temper addressing the conspiracy among True Temper and other shaft manufacturers. That complaint alleged that True Temper and several co-conspirators had entered into illegal contracts and agreements and engaged in an unlawful combination and conspiracy to restrain and monopolize the manufacture and sale of steel golf club shafts ("steel shafts") in violation of Sections 1 and 2 of the Sherman Act. The complaint named as co-conspirators two foreign manufacturers that made True Temper steel shafts under license from True Temper, as well as two foreign distributors jointly owned by

-2-

True Temper and the licensees that had been granted exclusive territories in which to sell True Temper steel shafts manufactured by the licensees. The complaint alleged that True Temper and its co-conspirators agreed to eliminate competition by allocating customers and territories.

Prior to trial defendant True Temper settled the charges by accepting entry of the 1959 Final Judgment on August 20, 1959. The 1959 Final Judgment required, among other things, that True Temper terminate agreements, including licensing agreements, with its co-conspirators and divest its financial interests in the distributor co-conspirators. It also enjoined True Temper from allocating markets, restricting imports or exports, fixing resale prices, or setting the terms or conditions for resale for its steel shafts, and from preventing third parties from importing steel shafts into the United States, except as necessary to prevent the unauthorized use of True Temper's patents or trademarks.

### B.    The 1961 Final Judgment

The United States filed another complaint against True Temper and the four manufacturer defendants alleging that the defendants had engaged in an unlawful combination and conspiracy to restrain and monopolize markets for golf clubs and steel shafts in violation of Sections 1 and 2 of the Sherman Act. That complaint further alleged that the four manufacturer defendants had colluded to fix the minimum wholesale prices of golf clubs made with branded True Temper steel shafts and to communicate those prices to True Temper, and that True Temper had agreed to facilitate this collusion by communicating the fixed minimum wholesale prices to other golf club manufacturers that purchased branded True Temper steel shafts, requiring these manufacturers to abide by the fixed prices, policing compliance, and refusing to deal with non-complying manufacturers. The complaint also alleged that the four manufacturer defendants agreed to exclude True Temper's competitors by purchasing steel shafts exclusively from True Temper, and had also agreed not to introduce fiberglass shafts unless all did so simultaneously. In addition, the complaint alleged that True Temper had refused to sell branded or specialty shafts (i.e., golf club shafts designed especially for one golf club manufacturer) to other golf club manufacturers without the approval of the four manufacturer defendants and had charged other

manufacturers higher prices for all True Temper steel shafts. Finally, the complaint alleged that the four manufacturer defendants and other manufacturers had agreed to sell golf clubs made with a particular True Temper shaft only to "pro shops"[3] and that True Temper refused to sell that type of shaft to any non-complying manufacturer.

Prior to trial defendant True Temper and the other defendants settled the charges by accepting entry of the 1961 Final Judgment on August 1, 1961. The 1961 Final Judgment restrains all the defendants from, among other things, agreeing among themselves or with any other person to fix the price or conditions for sale or resale of any golf club or shaft or to refrain from manufacturing or selling any type of golf club or shaft.

### C.    Provisions of the Final Judgments that Remain in Force

Five substantive provisions of the 1959 Final Judgment remain in effect,[4] and seventeen substantive provisions of the 1961 Final Judgment remain in effect.[5] The 1959 Final Judgment continues to bar True Temper from entering into agreements that (a) impose restrictions on the sale or distribution of its own steel shafts or (b) establish or maintain the prices or other terms or conditions for the sale or distribution of its steel shafts. The 1961 Final Judgment continues to: (a) enjoin True Temper and the four manufacturer defendants from entering into agreements to establish or maintain the prices or other terms or conditions for the sale or distribution of their respective products; (b) require True Temper to sell its steel shafts to all applying golf club manufacturers on non-discriminatory terms; and (c) enjoin the four manufacturer defendants from entering into exclusive distribution agreements for the distribution of their respective products.

---

[3]The term "pro shops" was defined in the complaint as "shops where golfing equipment is sold at retail, which are operated in connection with golf courses or driving ranges and are usually managed or operated by the golf professional attached to such course or driving range." (App. 4 at 4.)

[4]1959 Final Judgment at §§ IV(C), VI(A)-(C), and VII.

[5]1961 Final Judgment at §§ IV(A)-(D), V(B), VI(A)-(D), VII(A)-(F), VIII, and IX(B) .

As discussed below, none of these provisions is needed to protect competition in light of the long passage of time since the underlying conspiracies were ended, the many changes in industry circumstances over the past 45 years, and the fact that the antitrust laws adequately address any potentially anticompetitive conduct in which the parties to these decrees might engage. In addition, several provisions of the 1959 Final Judgment and the 1961 Final Judgment impose obligations that are inconsistent with modern antitrust law and policy, and their continued existence may well be inhibiting rather than preserving effective competition. Because the provisions of the decrees that remain in effect either are no longer necessary or may be interfering with the competitive process, their continued existence does not provide a public benefit and the 1959 Final Judgment and the 1961 Final Judgment therefore should be terminated as to all defendants.

## III.    LEGAL STANDARDS APPLICABLE TO TERMINATION OF AN ANTITRUST FINAL JUDGMENT WITH THE CONSENT OF THE UNITED STATES

This Court has jurisdiction to terminate the 1959 Final Judgment and the 1961 Final Judgment. Pursuant to Section X of the 1959 Final Judgment and Section XII of the 1961 Final Judgment, the Court retains jurisdiction to enable either party to apply to Court at any time for such further orders and directions as may be necessary or appropriate for the construction, carrying out, and enforcement of the provisions of the respective Final Judgments. Moreover, "the power of a court of equity to modify an injunction in adaptation to changed conditions" is "inherent in the jurisdiction of the chancery." *United States v. Swift & Co.*, 286 U.S. 106, 114 (1932). Under Rule 60(b)(5) of the Federal Rules of Civil Procedure, "[o]n motion and upon terms as are just, the court may relieve a party . . . from a final judgment . . . [when] it is no longer equitable that the judgment should have prospective application." *See also United States v. Int'l Bus. Machines Corp.*, 163 F.3d 737 (2d Cir. 1998) (affirming grant of joint motion by United States and defendant to terminate antitrust consent decree).

Where, as here, the United States tentatively consents to termination of some or all of the provisions of an antitrust judgment, the issue before the court is whether such termination is in

-5-

the public interest. *IBM*, 163 F.3d at 740; *United States v. Am. Cyanamid Co.*, 719 F.2d 558, 565 (2d Cir. 1983); *United States v. Loew's Inc.*, 783 F. Supp. 211, 213 (S.D.N.Y. 1992); *United States v. Columbia Artists Mgmt., Inc.*, 662 F. Supp. 865, 869-70 (S.D.N.Y. 1987). Exercising "judicial supervision," *IBM*, 163 F.3d at 740, the court should approve a consensual decree termination where the United States has provided a reasonable explanation to support the conclusion that termination is consistent with the public interest. *Loew's*, 783 F. Supp. at 214; *see also United States v. W. Elec. Co.*, 993 F.2d 1572, 1576-77 (D.C. Cir. 1993) (under "deferential" public interest test, court should accept a consensual termination of decree restrictions that the United States "reasonably regarded as advancing the public interest;" it is "not up to the court to reject an agreed-on change simply because the proposal diverge[s] from *its* view of the public interest"; rather, court "may reject an uncontested modification only if it has exceptional confidence that adverse antitrust consequences will result") (emphasis in original); *United States v. W. Elec. Co.*, 900 F.2d 283, 307 (D.C. Cir. 1990) (public interest test applies to a termination of decree restrictions with assent of all parties to the decree; district court should approve an uncontested termination "so long as the resulting array of rights and obligations is within the *zone of settlements* consonant with the public interest *today*") (emphases in original).

The "public interest" standard takes its meaning from the purposes of the antitrust laws. *IBM*, 163 F.3d at 740; *Am. Cyanamid*, 719 F.2d at 565. As the Second Circuit has emphasized, "[t]he purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market." *IBM*, 163 F.3d at 741-42 (alteration in original) (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993)). The purpose of an antitrust decree is to remedy and prevent the recurrence of the violation alleged in the complaint. Where the government has consented to termination, the focus is on whether there is a "likelihood of a potential future violation, rather than the mere possibility of a violation." *IBM*, 163 F.3d at 742. In this context, if the government reasonably explains why there is "no current need for" the constraints imposed by a decree, termination will serve "the public interest in 'free

-6-

and unfettered competition as the rule of trade.'" *Loew's*, 783 F. Supp. at 213, 214 (quoting *N. Pac. Ry. v. United States*, 356 U.S. 1, 4 (1958)).

Obsolete decrees are worse than unnecessary; they may themselves have anticompetitive effects, burdening the parties, the courts, and the competitive process. *See, e.g., IBM*, 163 F.3d at 740; *Loew's*, 783 F. Supp. at 214. Where the United States and the defendant(s) jointly seek termination long after entry of a decree that has no termination date, it is reasonable to presume that the violation has long since ceased and that competitive conditions were adequately restored. Thus, for example, the Second Circuit affirmed termination of the *IBM* decree under the public interest standard because there was no longer any material threat of antitrust violations absent the decree restrictions and because the decree "resulted in artificial restraints . . . which do not further the cause of healthy competition." *IBM*, 163 F.3d at 740. Termination of an antitrust decree, of course, leaves the parties "fully subject to the antitrust laws of general application." *Loew's*, 783 F. Supp at 214.

## IV.   REASONS WHY THE UNITED STATES HAS TENTATIVELY CONSENTED TO TERMINATION OF THE 1959 FINAL JUDGMENT AND THE 1961 FINAL JUDGMENT

Termination of the Final Judgments is plainly in the public interest. The United States' extensive experience with the enforcement of the antitrust laws has shown that, as a general matter, industries evolve and change over time in response to competitive and technological forces. In most situations, the passage of many decades results in significant industry change that renders the rigid prohibitions placed years before in consent decrees either irrelevant to the defendants' ongoing compliance with the antitrust laws or an affirmative impediment to the kind of adaptation to change that is a hallmark of the competitive process.

These considerations, among others, led the Antitrust Division of the Department of Justice in 1980 to establish a policy of including in every consent decree a so-called "sunset provision" that, except in exceptional cases, would result in the decree's automatic termination

-7-

after no more than ten years.[6] As a result of the Antitrust Division's consistent adherence to this

policy, the only antitrust consent decrees to which the United States is a party that remain in

effect are those entered within the past ten years, or before 1980 when the "sunset" policy was

adopted. The Antitrust Division has encouraged parties to old decrees to seek the Division's

consent to their termination, especially where such decrees contain provisions that may be

restricting competition. *See* U.S. Department of Justice, Antitrust Division, DOJ Bull. No. 1984-

04, *Statement of Policy by the Antitrust Division Regarding Enforcement and Review of*

*Permanent Injunctions Entered in Government Antitrust Cases* (attached as Appendix 5); Press

Release, U.S. Department of Justice, *Department of Justice Announces New Protocol to Expedite*

*Review Process for Terminating or Modifying Older Antitrust Decrees* (April 13, 1999) (attached

as Appendix 6).[7] In the United States' view, consent decrees entered prior to 1980 should be

---

[6]*Antitrust Division Manual*, § IV.E.2 (1998 ed.). This change in policy followed
Congress' 1974 amendment of the Sherman Act to make violations a felony, punishable by
substantial fines and jail sentences. With these enhanced penalties for *per se* violations of the
antitrust laws, the Division concluded that antitrust recidivists could be deterred more effectively
by a successful criminal prosecution under the Sherman Act than by a criminal contempt
proceeding under provisions of an old consent decree aimed at preventing a recurrence of price-
fixing and other hard-core antitrust violations. *See United States v. Columbia Artists Mgmt.,*
*Inc.*, 662 F. Supp. 865, 867 (S.D.N.Y. 1987).

[7]In addition, in the early 1980s, the Division conducted its own review of more than
1,200 old consent decrees then in effect to ensure that none "hinder[ed] . . . competition" or
"reflect[ed] erroneous economic analysis and thus produce[d] continuing anticompetitive
effects." The Honorable William French Smith, Attorney General of the United States, *Remarks*
*at the Annual Meeting of the District of Columbia Bar* (June 24, 1981), at 11. Although that
effort was necessarily constrained by the Division's limited resources and other enforcement
priorities, it did lead to the termination of several decrees that at the time appeared most
problematic. *See also* Antitrust Division and Office of Legal Counsel of the Department of
Justice, concerning Department of Justice Authorization for Fiscal Year 1984: *Hearing Before*
*the Subcomm. on Monopolies & Commercial Law of the H. Comm. on the Judiciary*, 98th Cong.
95 (1983) (Testimony of William F. Baxter, Assistant Attorney General, U.S. Department of
Justice); Jeffrey I. Zuckerman, *Removing the Judicial Fetters: The Antitrust Division's Judgment*
*Review Project* (1982) at 2-3 (attached as Appendix 7).

terminated unless there are affirmative reasons for continuing them, which we would expect to exist only in limited circumstances.[8]

In this case, there are several specific reasons why immediate termination of these two nearly half-century old consent decrees would be in the public interest. First, since the 1959 Final Judgment and the 1961 Final Judgment were entered, the anticompetitive conduct that gave rise to the United States' complaints has long since ended, and there have been substantial changes in the golf club industry that render the decree provisions largely irrelevant and indeed potentially anticompetitive. In addition, antitrust case law has also changed such that certain conduct that at one time was regarded as *per se* unlawful – and which is still categorically prohibited by these consent decrees – is now understood to have procompetitive potential and thus is analyzed under the rule of reason. Categorical prohibitions against such conduct, such as those contained in these decrees, are no longer desirable except in circumstances – no longer present here – where they are necessary to remedy antitrust violations. The United States has consented to termination of final judgments in circumstances such as these. *See, e.g., Eastman Kodak*, 63 F.3d at 97-100; *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 248 (1968).

## A.    Changes in Antitrust Law and the Golf Club Industry Render the Final Judgments Unnecessary

Both the 1959 Final Judgment and 1961 Final Judgment have been in effect for more than 45 years. The conspiracies that gave rise to the United States' enforcement actions here have long since ended. Moreover, in the intervening years tremendous change – including entry by many new golf club and club shaft manufacturers and significant technological evolution – has dramatically altered the structure of the worldwide golf club industry. These industry

---

[8]Among the circumstances where continuation of a decree entered more than ten years ago may be in the public interest are: (1) a pattern of noncompliance by the parties with significant provisions of the decree; (2) a continuing need for the decree's restrictions to preserve a competitive industry structure; and (3) longstanding reliance by industry participants on the decree as an essential substitute for other forms of industry-specific regulation where market failure cannot be remedied through structural relief. None of these circumstances is present in this case.

changes have led to a market less prone to the type of collusive conduct that the 1959 Final Judgment and the 1961 Final Judgment sought to remedy.

In 1956 sales of the four manufacturer defendants accounted for about 80 percent of golf club sales in the United States by dollar volume. Today the golf club industry is increasingly global, with an estimated 40 manufacturers around the world competing to sell clubs in the United States.

In 1958 nearly all golf club shafts were steel, and True Temper produced 90 percent of the steel shafts sold in the United States. Today a significant (and growing) portion of all golf club shafts sold in the United States are made of carbon composites (such as graphite) and are imported from Europe and Asia in the increasingly global marketplace for golf equipment. Graphite shafts account for approximately 40 percent of worldwide sales by unit volume and 60 percent by dollar volume. An estimated 80 firms manufacture graphite shafts worldwide. The manufacture of steel shafts has also evolved, with firms other than True Temper accounting for a significant and growing share of such shafts. True Temper now manufactures both steel and graphite shafts, accounting for approximately 36 percent of worldwide sales by dollar volume.

True Temper's worldwide share of steel shafts now is approximately 70 percent by unit volume, and its worldwide share of graphite shafts is about 11 percent by unit volume. Although True Temper's shares of steel and graphite shafts sold in the United Stated are harder to calculate – since clubs using those shafts are manufactured in the United States and shipped abroad, or manufactured abroad and then sold into the United States – True Temper's estimated shares are comparable to its worldwide shares.

As a result of this evolution, the golf club industry is less prone to the sort of anticompetitive coordination engaged in by True Temper and the four manufacturer defendants today than in the years leading up to the consent decrees. Due to the availability of steel and graphite shafts from many other sources, True Temper is less able to organize or facilitate coordination among golf club manufacturers. For example, golf club manufacturers would have a greater ability to acquire shafts from a supplier other than True Temper if True Temper

-10-



threatened to refuse to deal with them (in the manner addressed in the 1961 Final Judgment). Similarly, shaft manufacturers would have a greater ability to sell their shafts to club manufacturers other than the four manufacturer defendants in the event the four manufacturer defendants threatened to refuse to purchase shafts from them.

Several of the provisions of the Final Judgments are aimed directly at eliminating the cartel behavior of True Temper and the four manufacturer defendants, such as those prohibiting defendants from allocating territories and fixing prices. These provisions duplicate existing antitrust laws that deem certain types of agreement *per se* unlawful. The penalties for violation of the Sherman Act are more severe than those that could be obtained by holding a defendant in contempt under an outstanding decree. The Antitrust Division believes that these antitrust penalties provide greater deterrence to resumption of the challenged anticompetitive conduct than would the threat for criminal contempt of the decrees and thus typically does not seek to preserve such decree provisions.

**B.     Provisions of the Final Judgments Prohibit Potentially Procompetitive Conduct that Modern Antitrust Law Allows**

As discussed above, five substantive provisions of the 1959 Final Judgment and seventeen substantive provisions of the 1961 Final Judgment remain in effect. These provisions cover a variety of prohibitions, including provisions enjoining the four manufacturer defendants from entering into exclusive distribution agreements for the distribution of their products; barring True Temper from entering into agreements that impose restrictions on the sale or distribution of its own steel shafts or that establish or maintain the prices or other terms or conditions for the sale or distribution of its steel shafts; and requiring True Temper to sell its steel shafts to all applying golf club manufacturers on non-discriminatory terms.

Substantive antitrust law has evolved significantly since entry of the 1959 Final Judgment and the 1961 Final Judgment, rendering many of these provisions unnecessary or potentially barring procompetitive conduct. For example, in 1961 so-called "vertical restraints," including agreements between a manufacturer and its distributors regarding territories in which a

-11-

distributor may sell and the prices that it may charge for the manufacturer's products, were considered *per se* unlawful, and would have been illegal regardless of the market power of the participants or the justifications offered for the agreements. Today, however, these types of vertical restraints would be analyzed under the rule of reason because it has been established that they have the potential to increase efficiency and enhance interbrand competition. Since the nearly five decades since these decrees were entered, the Supreme Court has decided *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977), which held the *per se* rule inapplicable to vertical non-price restraints; *State Oil Co. v. Khan*, 522 U.S. 3 (1997), which held that maximum resale price restraints should not be condemned as *per se* unlawful; and *Leegin Creative Leather Products v. PSKS, Inc.*, 127 S. Ct. 2705 (2007), which held that minimum resale price restraints also must be analyzed under the rule of reason. As the Supreme Court explained in *Leegin*,

> The justifications for vertical price restraints are similar to those for other vertical restraints. Minimum resale price maintenance can stimulate interbrand competition – the competition among manufacturers selling different brands of the same type of product – by reducing intrabrand competition – the competition among retailers selling the same brand. The promotion of interbrand competition is important because "the primary purpose of the antitrust laws is to protect [this type of] competition."

127 S. Ct. at 2715 (internal citations omitted).

Likewise, it is well accepted that the antitrust laws do not categorically prohibit firms from imposing reasonable restrictions on the licensees of their intellectual property, but several of the prohibitions of the Final Judgments do just that. Under the 1961 Final Judgment, True Temper is prohibited from entering into any agreement that would restrict a club manufacturer to which it has disclosed its proprietary designs from selling golf club shafts made using True Temper's proprietary designs to third parties without authorization from True Temper. The continued existence of provisions such as these that prohibit the defendants from engaging in potentially procompetitive conduct – regardless of whether that conduct is likely to have any adverse effect on competition – threatens to hamper the vigor of competition and unfairly disadvantage these defendants relative to their rivals. By limiting True Temper's freedom to

negotiate efficient licensing provisions, including those aimed at controlling the misappropriation of its intellectual property, True Temper may well be deterred from entering such licensing arrangements, which may lead to less efficient manufacturing or distribution of True Temper shafts, in competition with the shafts made by numerous other rival firms worldwide.

These provisions of the Final Judgments are unnecessary, inconsistent with modern antitrust standards, and restrict the ability of True Temper and the four manufacturer defendants to compete with competitors not subject to the consent decrees. Moreover, these provisions may have the unintended anticompetitive effect of imposing unnecessary inefficiencies and raising distribution costs for golf clubs and shafts, and may put True Temper and the four manufacturer defendants at a competitive disadvantage.

### C.    Conclusion

The 1959 Final Judgment and the 1961 Final Judgment were designed to restore and maintain competition in an industry that, at that time, was prone to collusion. However, as a result of the above-described changes in the golf club industry, including the entry of new foreign competitors and significant technological developments in the manufacturing process, the golf club industry is less susceptible to a recurrence of the collusive arrangements targeted by these decrees a half-century ago. These industry changes, together with significant changes in the application of the antitrust laws over the last forty-five years, suggest that the 1959 Final Judgment and the 1961 Final Judgment are no longer serving the procompetitive purpose that they were originally designed to serve, and their continued existence does not provide a public benefit. Therefore, the United States believes that termination of the 1959 Final Judgment and the 1961 Final Judgment would be in the public interest and tentatively consents to such termination.

## V.    PROPOSED PROCEDURES FOR PROVIDING PUBLIC NOTICE OF THE PENDING MOTIONS AND INVITING COMMENT THEREON

In *United States v. Swift & Co.*, the court noted its responsibility to implement procedures that will provide non-parties adequate notice of, and an opportunity to comment upon, antitrust judgment modifications proposed by consent of the parties:

> Cognizant . . . of the public interest in competitive economic activity, established chancery powers and duties, and the occasional fallibility of the Government, the court is, at the very least, obligated to ensure that the public, and all interested parties, have received adequate notice of the proposed modification. . . .

*Swift & Co.*, 1975-1 Trade Cas. (CCH) ¶ 60,201, at ¶ 65,703 (N.D. Ill. 1975) (footnote omitted).

In accord with Antitrust Division policies, the United States proposes, and True Temper has agreed to, the following notice and comment procedures:

1.    The United States will publish in the *Federal Register* a notice announcing True Temper's motion to terminate the 1959 Final Judgment and the 1961 Final Judgment, and the United States' tentative consent to it, summarizing the complaint and decrees, describing the procedures for inspecting and obtaining copies of relevant papers, and inviting the submission of comments.

2.    True Temper will publish, at its own expense, notice of the motion in two consecutive issues of *The Wall Street Journal* and *Golf World*. These periodicals are likely to be read by persons interested in the markets affected by the 1959 Final Judgment and the 1961 Final Judgment. The published notices will provide for public comment during the sixty days following publication of the last notice.

3.    Within a reasonable period of time after the conclusion of the sixty-day period, the United States will file with the Court copies of any written comments that it receives and its response to those comments.

4.    The parties request that the Court not rule upon the Motion to Terminate for at least seventy days after the last publication of the notices described above (i.e., for at least ten days after the close of the period for public comment).

These procedures are designed to provide notice to all potentially interested persons, informing them that a motion to terminate the 1959 Final Judgment and the 1961 Final Judgment is pending and providing them an opportunity to comment thereon. True Temper has agreed to follow this procedure, including publication of the appropriate notice. The United States reserves the right to withdraw its consent to the motions at any time prior to entry of an order terminating the 1959 Final Judgment and the 1961 Final Judgment.

## VI.    CONCLUSION

For the foregoing reasons, the United States tentatively consents to the termination of the 1959 Final Judgment and the 1961 Final Judgment.

Dated: April 15, 2008                              Respectfully submitted,


Rosemary Simota Thompson
Attorney for the United States
United States Department of Justice
Antitrust Division
209 South LaSalle Street, Suite 600
Chicago, Illinois  60604
(312) 353-7530
(312) 353-1046 (facsimile)
rosemary.thompson@usdoj.gov

List of Exhibits

Appendix 1          Final Judgment <u>US v. True Temper Corp.</u>, Civ. Action No. 58 C 1158

Appendix 2          Final Judgment <u>US v. True Temper, et al.</u>, Civ. Action No. 58 C 1159

Appendix 3          Complaint, <u>US v. True Temper Corp.</u>, Civ. Action No. 58 C 1158

Appendix 4          Complaint, <u>US v. True Temper, et al.</u> Civ. Action No. 58 C 1159

Appendix 5          Press Release
                    U.S. Department of Justice Announces New Protocol to Expedite Review
                    Process for Terminating or Modifying Older Antitrust Decrees

Appendix 6          Press Release

Appendix 7          Removing the Judicial Fetters: The Antitrust Division's Judgment Review
                    Project, (1982)

# Appendix 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,       )
                                )
                 Plaintiff,     )
                                )        Civil Action
                                )        No. 58 c 1158
         vs.                    )
                                )
TRUE TEMPER CORPORATION,        )
                                )
                 Defendant.     )

## FINAL JUDGMENT

Plaintiff, United States of America, having filed its complaint herein on June 30, 1958, and the defendant herein, True Temper Corporation, having appeared by its attorneys, and said plaintiff and defendant having severally consented to the entry of this Final Judgment herein, without trial or adjudication of any issue of fact or law herein and without admission by any party in respect to any such issue;

NOW, THEREFORE, before any testimony has been taken and without trial or adjudication of any issue of fact or law herein, and upon consent as aforesaid of the parties hereto, it is hereby,

ORDERED, ADJUDGED AND DECREED as follows:

I.

This Court has jurisdiction of the subject matter herein and of the parties hereto.  The complaint states

Civ. 58 C 1158

True Temper Corp.

claims for relief under Sections 1 and 2 of the Act of
Congress of July 2, 1890 (15 U.S.C. §§ 1 and 2), entitled
"An act to protect trade and commerce against unlawful
restraints and monopolies", commonly known as the Sherman
Act, as amended.

## II.

As used in this Final Judgment:

(A)  "Defendant" shall mean True Temper Corporation,
a corporation which is organized and existing under the laws
of the State of Ohio (and which prior to 1949 operated
under the name of The American Fork and Hoe Company), having
its principal place of business at 1623 Euclid Avenue,
Cleveland, Ohio;

(B)  "Foreign Company" or "Foreign Companies" shall
mean any, some, or all of the following:

1.  Accles and Pollock Limited, a company,
organized under the laws of the United Kingdom,
having an office in Oldbury, England;

2.  Australian Steel Golf Shafts Proprietary
Limited, a corporation organized under and pursuant
to the Companies Act (South Australia) 1936, having
an office in Adelaide, Australia;

3.  British Steel Golf Shafts Limited, a company
organized under the laws of the United Kingdom,
having an office in Oldbury, England;

2

4.  **British Tube Mills (Australia) Proprietary Limited**, a corporation organized under and pursuant to the Companies Act (South Australia) 1936, having an office in Adelaide, Australia;

5.  **Stewarts & Lloyds (Australia) Proprietary Limited**, a company incorporated in Australia with offices in Adelaide, Australia.

6.  **Tube Investments Limited**, a company organized under the laws of the United Kingdom;

(C)  "Person" shall mean any individual, partnership, firm, association, corporation or other legal entity.

(D)  "Principal Stockholder" of a corporation shall mean any person who owns of record or beneficially 5 per cent or more of the outstanding voting stock of such corporation.

(E)  "Steel Shafts" shall mean tubular steel shafts produced for use as a component part of golf clubs.

(F)  "Subsidiary" of Defendant shall mean any corporation 50% or more of the voting stock of which is owned or, directly or indirectly, controlled by Defendant.

### III.

The provisions of this Final Judgment applicable to Defendant shall apply to its officers, directors, agents, employees, subsidiaries, successors and assigns, and to those persons in active concert or participation with it who receive notice of this Final Judgment by personal service or otherwise.

3

For the purposes of this Final Judgment Defendant and its
directors, agents, employees, subsidiaries, or any of them,
when acting in such capacity, shall be deemed to be one
person.

IV.

Defendant is hereby:

(A) Ordered and directed to terminate and cancel, to
the extent not heretofore cancelled, expired, terminated
or suspended, the following agreements:

(1) Agreement, dated January 13, 1930, between
Accles and Pollock Limited and The American Fork
and Hoe Company;

(2) Agreement, dated July 16, 1930, between
Accles and Pollock Limited and The American Fork and
Hoe Company;

(3) Agreement, dated June 1, 1931, among The
American Fork and Hoe Company, Accles and Pollock
Limited, and British Steel Golf Shafts Limited;

(4) License Agreement, dated December 12, 1931,
between The American Fork and Hoe Company and Accles
and Pollock Limited;

(5) License Agreement, dated October 13, 1932,
between The American Fork and Hoe Company and Accles
and Pollock Limited;

4

(6)  Agreement, dated November 5, 1948, among
The American Fork and Hoe Company, Accles and
Pollock Limited, and British Steel Golf Shafts Limited;

(7)  Agreement, dated February 15, 1949,
between Accles and Pollock Limited and The
American Fork and Hoe Company;

(8)  Agreement, dated September 4, 1956,
among Defendant, Accles and Pollock Limited,
and British Steel Golf Shafts Limited;

(B)  Ordered and directed to terminate and cancel,
within ninety (90) days from the date of entry of this
Final  Judgment, each of the following agreements which
shall not theretofore have been terminated or cancelled:

(1)  License Agreement, dated September 14,
1939, between The American Fork and Hoe Company
and British Tube Mills (Australia) Proprietary
Limited;

(2)  Agreement, dated December 16, 1938,
between The American Fork and Hoe Company and
Accles and Pollock Limited;

(3)  Agreement, dated September 14, 1939,
among The American Fork and Hoe Company, Accles
and Pollock  Limited, British Steel Golf Shafts
Limited, British Tube Mills (Australia) Proprietary
Limited, and Australian Steel Golf Shafts

5

Proprietary Limited;

(4) Agreement, dated September 14, 1939,
between The American Fork and Hoe Company and British
Tube Mills (Australia) Proprietary Limited;
provided, however, that Defendant may receive payment of
any amounts which shall have accrued for payment under
any of said agreements prior to the date of the termination
required by this subsection (B);

(C) Enjoined and restrained from adhering to, per-
forming, reviving or enforcing any agreement cancelled
pursuant to subsection (A) or (B) of this Section IV, and
from entering into or adhering to any other agreement,
contract or understanding which contains any provision
contrary to or inconsistent with any provision of this
Final Judgment.

## V.

Defendant is ordered and directed to furnish within
ninety (90) days after the entry of this Final Judgment a
true copy thereof to each Foreign Company which is a party
to any agreement the termination or cancellation of which
is ordered by Section IV of this Final Judgment.

## VI.

Defendant is enjoined and restrained from entering into,
adhering to, maintaining or enforcing any contract, agreement
or understanding with any other person, the purpose or effect

of which is, or may be, to:

(A) Allocate or divide territories, markets or customers for the manufacture, sale or distribution of Steel Shafts;

(B) Restrict or limit imports into or exports from the United States of Steel Shafts;

(C) Fix prices, terms or conditions for the sale of Steel Shafts to or by any third person.

## VII.

Defendant is enjoined and restrained from, directly or indirectly, limiting, restricting or preventing or attempting to limit, restrict or prevent any other person from importing into the United States Steel Shafts manufactured outside the United States or from exporting outside the United States Steel Shafts manufactured in the United States provided, however, that nothing in this Final Judgment shall be deemed to prohibit Defendant from exercising such lawful rights as it may have under the laws of the United States relating to patents and trade-marks to prevent the unauthorized use, by others, of any patent or trade-mark issued to Defendant.

## VIII.

(A) Upon expiration of seven months after entry of this Final Judgment, Defendant is enjoined and restrained from exercising, directly or indirectly, voting power of any stock or financial interest which Defendant may then own in

7

any Foreign Company.

(B) Defendant is ordered and directed within thirty
(30) days after entry of this Final Judgment to initiate
such steps as may be necessary to divest itself, within seven
(7) months after entry of this Final Judgment, of all stock or
financial interest which it may have in any Foreign Company,
and shall thereafter divest itself of such stock or financial
interest.

(C) Defendant is enjoined and restrained from:

(1)  Disposing of any of the stock required to
be divested under the provisions of this Section VIII
to any subsidiary of Defendant, or any officer or
principal stockholder of Defendant or of its subsidiaries,
or any individual directly or indirectly affiliated
with Defendant or related to any of its officers or
directors, or any company in which any officer or
director of Defendant is a principal stockholder.

(2)  Reacquiring any stock or financial interest
required to be divested under the provisions of this
Section VIII;

(3)  Hereafter acquiring, by purchase, merger or
otherwise, any stock, financial or managerial interest
in and to any Foreign Company;

(4)  Permitting any of its officers, directors,
or employees to serve, at the same time, as an

8

officer, director, or employee of any Foreign

Company, or any other person engaged in the manu-

facture, sale or distribution of Steel Shafts.

(D)  Defendant is ordered and directed within ninety

(90) days after the date of this Final Judgment to file

with this Court and serve upon the plaintiff conformed

copies of the resignation of each of its officers, directors,

or employees from any position held by them at the time of

entry of this Final Judgment with any Foreign Company.

(E)  If within a period of seven months after the

entry of this Final Judgment Defendant has sold or otherwise

divested itself of such stock or financial interest in any

Foreign Company, Defendant is ordered and directed to file

with this Court and serve upon plaintiff a report showing

the fact and manner of Defendant's compliance with this

requirement.

(F)  If, at the end of such period of seven months after

entry of this Final Judgment, Defendant shall not have sold

or divested itself of such stock or financial interest in

each Foreign Company then, and in that event, Defendant

is ordered and directed to file with this Court and serve

upon plaintiff a report of such fact.  This Court shall

then, and in that event, enter a further order herein pro-

viding for (1) transfer by Defendant of such stock or

financial interest in such Foreign Companies to a trustee

9

to be appointed by this Court and (2) authority in such
trustee to sell or otherwise dispose of such stock or
financial interest of Defendant in such Foreign
Companies upon such terms and conditions as to this
Court may appear appropriate after notice and opportunity
by the parties to be heard.  Such trustee shall have power
to hold such stock or financial interest of Defendant,
to receive and pay to Defendant any dividends accruing
thereon and shall be paid such compensation as may be
directed by this Court and such trustee shall submit to
this Court and to plaintiff such reports as may be directed
by this Court regarding the performance of his trust.

IX.

For the purpose of securing compliance with this
Final Judgment, and for no other purpose, and subject to
any legally recognized privilege, duly authorized repre-
sentatives of the Department of Justice shall upon the
written request of the Attorney General or the Assistant
Attorney General in charge of the Antitrust Division, and
on reasonable notice to Defendant made to its principal
office, be permitted:

(A)  Access, during the office hours of Defendant,
to the books, ledgers, accounts, correspondence, memoranda
and other records or documents in the possession or under
the control of Defendant relating to any matters contained

10

in this Final Judgment; and

(B)  Subject to the reasonable convenience of
Defendant and without restraint or interference from
it, to interview officers or employees of Defendant, who
may have counsel present, regarding any such matters.

*  Upon such written request Defendant shall submit
such reports in writing to the Department of Justice
with respect to matters contained in this Final Judgment
as may from time to time be necessary for the enforcement
of said Judgment.  No information obtained by means pro-
vided in this Section IX shall be divulged by any repre-
sentative of the Department of Justice to any person
other than a duly authorized representative of the Executive
Branch of plaintiff, except in the course of legal proceedings
to which the United States is a party for the purpose of
securing compliance with this Final Judgment or as otherwise
required by law.

X.

Jurisdiction is retained for the purpose of enabling
either party to this Final Judgment to apply to this Court
at any time for such further orders and directions as may
be necessary or appropriate for the construction or carrying
out of this Final Judgment, for the modification of any of the

11

provisions thereof, for the enforcement of compliance

therewith and for the punishment of violations thereof.

Enter:

/s/ William J. Campbell
United States District Judge

Dated: August 20, 1959

We hereby consent to the making and entry of the foregoing

Final Judgment:

FOR THE PLAINTIFF:

/s/  Robert A. Bicks
Robert A. Bicks
Acting Assistant Attorney
General

/s/ Earl A. Jinkinson
Earl A. Jinkinson

/s/ W. D. Kilgore, Jr.
W. D. Kilgore, Jr.

/s/ Harry N. Burgess
Harry N. Burgess

/s/ George H. Schueller
George H. Schueller

/s/ Willis L. Hotchkiss
Willis L. Hotchkiss

/s/ Thomas J. Rooney
Thomas J. Rooney

/s/ Samuel J. Betar, Jr.
Samuel J. Betar, Jr.

Attorneys, Department of Justice

12

FOR THE DEFENDANT:


/s/ John C. Butler
        John C. Butler


/s/ Robert H. Bork
        Robert H. Bork


/s/ John H. Watson, Jr.
        John H. Watson, Jr.

13

# Appendix 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

UNITED STATES OF AMERICA,               )
                                        )
                      Plaintiff,        )
                                        )          CIVIL ACTION
            v.                          )
                                        )          NO. 58 C 1159
TRUE TEMPER CORPORATION;                )
WILSON ATHLETIC GOODS MFG.              )
CO., INC.; A. G. SPALDING               )
& BROS., INC.; MacGREGOR                )
SPORT PRODUCTS, INC.; and               )
HILLERICH & BRADSBY CO.,                )
                                        )
                      Defendants.       )

At Chicago, Illinois, in said Division
and District on August 1, 1961.


FINAL JUDGMENT

Plaintiff, United States of America, having filed its complaint
herein on June 30, 1958, each of the defendants having appeared, and
the plaintiff and each of the defendants, by their respective
attorneys, having consented to the entry of this Final Judgment
without trial or adjudication of any issue of fact or law herein,
and without said judgment constituting evidence or an admission
by any party with respect to any such issue;

NOW, THEREFORE, before the taking of any testimony and without
trial or adjudication of any issue of fact or law herein, and upon

consent of the plaintiff and each defendant, it is hereby

ORDERED, ADJUDGED, and DECREED as follows:

I

This Court has jurisdiction of the subject matter of this action and of the parties hereto.  The complaint states claims upon which relief against the defendants may be granted under Sections 1 and 2 of the Act of Congress of July 2, 1890, entitled "An Act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the Sherman Act, as amended.

II

As used in this Final Judgment:

(A)  "Defendant club manufacturers" shall mean Wilson Athletic Goods Mfg. Co., Inc., a Delaware corporation, A. G. Spalding & Bros., Inc., a Delaware corporation, MacGregor Sport Products, Inc., an Ohio corporation, and Hillerich & Bradsby Co., a Kentucky corporation;

(B)  "True Temper" shall mean the defendant True Temper Corporation, an Ohio corporation;

(C)  "Golf club" shall mean and include any kind, variety, style, or type of club used in playing the game of golf, regardless of the material out of which such club or any component thereof is made;

(D)  "Club manufacturer" shall mean any person engaged in the production or assembly of golf clubs;

(E)(1)  "Shaft" shall mean the shaft component of golf clubs, whether made of steel or other material;

2

(2)  "Standard shaft" shall mean any shaft (other than special shafts) manufactured and sold by defendant True Temper in its regular course of business;

(3)  "Special shaft" shall mean any shaft manufactured by defendant True Temper for and sold to a single club manufacturer according to a specially developed design (i) different from the design of any other shafts produced by True Temper and (ii) set forth or confirmed in writing to defendant True Temper by the particular club manufacturer for whom such special shafts are being or to be manufactured;

(F)  "Jobber" shall mean any person, other than a club manufacturer, who purchases golf clubs for resale to other jobbers or to dealers;

(G)  "Dealer" shall mean any person, other than a club manufacturer, who purchases golf clubs from any club manufacturer or jobber for resale to ultimate consumers;

(H)  "Person" shall mean any individual, partnership, firm, association, corporation, or other legal entity;

(I)  "Subsidiary" shall mean any person more than fifty per cent of whose stock is, directly or indirectly, owned or controlled by a defendant.

### III

The provisions of this Final Judgment applicable to any defendant shall apply to each of its officers, directors, agents, employees, sub-sidiaries, successors and assigns, and to all other persons in active concert or participation with any such defendant who shall have received actual notice of this Final Judgment by personal service or otherwise. For the purposes of this Final Judgment each defendant and its officers, directors, agents, employees, subsidiaries, or any of them, when acting in such capacity, shall be deemed to be one person.

### IV

The defendants, and each of them, are jointly and severally enjoined and restrained from, directly or indirectly, entering into, adhering to, maintaining, enforcing, or attempting to enforce, any contract, agreement, understanding, plan, or program among themselves or with any other person:

(A) To fix, establish, maintain, or enforce prices or other terms or conditions for the sale or resale of any shaft or golf club to third persons; provided that after the expiration of five years following the entry of this Final Judgment each defendant may, acting independently, and not in concert with one another or with any other person, exercise such lawful rights, if any, as each may have under the so-called Miller-Tydings Act with respect to golf clubs sold by it;

(B) To establish or maintain any particular or uniform time or season for the introduction of new models, types, grades, or styles of shafts or golf clubs or accessories, or to hinder, restrict, limit, or prevent any person from introducing, at any time, any model, type, grade,

4

or style of shaft, golf club, or accessory;

(C)  To refrain from manufacturing, distributing, or selling any particular kind, type, grade, or style of shaft or golf club, or golf clubs embodying any particular kind, type, grade, or style of shaft;

(D)  To hinder, restrict, limit, or prevent, or attempt to hinder, restrict, limit, or prevent any third person from purchasing (i) standard shafts or (ii) his own special shafts from True Temper or any other source.

The provisions of this Section IV shall not apply to transactions solely between (a) a defendant and its subsidiary or subsidiaries, (b) a defendant and its parent corporation, and (c) a defendant and corporations affiliated therewith through common ownership and controlled by the same parent corporation.

## V

(A)  Any contract or agreement existing on the date of this Final Judgment by the terms of which (i) any defendant club manufacturer is required, or obligated, to purchase all, or any designated percentage or proportion, of its requirements for shafts from defendant True Temper or (ii) defendant True Temper is required or obligated to sell to any defendant club manufacturer all or any designated percentage of proportion of the requirements of such defendant club manufacturer for shafts, is hereby ordered cancelled as of the date of this Final Judgment.

(B)  The defendants are jointly and severally enjoined and restrained from renewing, adhering to, maintaining, or claiming any rights under any contract or agreement cancelled by the foregoing subsection (A) or entering into any like or similar contract or agreement with any other defendant.

5

## VI

(A)  Defendant True Temper is enjoined and restrained from directly or indirectly:

(1)  Fixing, suggesting, or influencing, or attempting to fix, suggest, or influence the price or prices (including resale prices), terms or conditions upon which any golf club or shaft may or shall be sold by any other person;

(2)  Hindering, restricting, limiting or preventing, or attempting to hinder, restrict, limit or prevent any other person from (a) manufacturing or selling any shaft or golf club for or to any third person or class of persons, or (b) purchasing any shaft or golf club from any manufacturer thereof;

(3)  Making proposals or suggestions to any club manufacturer, jobber, or dealer regarding (a) the price or prices at which any such club manufacturer, jobber, or dealer sells, has sold, or will sell any golf club, (b) the person or persons, or categories of persons, to whom any such club manufacturer, jobber, or dealer sells, has sold or will sell any golf club, or (c) the person or persons to whom defendant True Temper sells, has sold or will sell any standard shaft;

(4)  Giving, or offering to give, to any club manufacturer in the United States, in connection with any sale of standard

6

shafts, any price, discount, rebate, or advertising or other allowance, except such as (a) are lawful under applicable laws of the United States relating to price discrimination, (b) shall have first been published generally to the trade, and (c) shall be available to all purchasers upon the published terms and conditions; provided, however, that in any suit or proceeding which may hereafter be instituted by the plaintiff against defendant True Temper, in which the plaintiff shall have established a _prima_ _facie_ case that defendant True Temper has violated this section, defendant True Temper may rebut such _prima_ _facie_ case by showing that the difference in price, discount, rebate, advertising, or other allowance, term or condition of sale was (i) lawful under the applicable laws of the United States relating to the meeting of competition, and (ii) was made, offered, or given in good faith by defendant True Temper in order to meet an equally low price, discount, rebate, advertising, or other allowance, or term or condition of sale, offered, or given by a competitor;

(5) Entering into any contract, agreement, understanding, plan, or program with any club manufacturer whereby defendant True Temper offers, or undertakes to (a) refuse to sell any shaft (other than special shafts) to any other

7

club manufacturer, or (b) limit or restrict its production
of shafts to special shafts of any defendant club
manufacturer;

    (6)  Coercing, compelling, or otherwise requiring, or in any
manner, attempting to coerce, compel, or otherwise require,
any golf club manufacturer in the United States to enter
into any contract or agreement obligating such golf club
manufacturer to purchase all or any designated percentage
or proportion of its requirements of shafts from the
defendant True Temper or any other source.

   (B)  Defendant True Temper is ordered and directed to sell standard
shafts to any club manufacturer in the United States who makes applica-
tion in writing to True Temper, upon its usual and normal trade terms
and conditions, including credit requirements, without any discrimination
whatsoever as to availability, price, terms, conditions, or credit
requirements; provided, however, that subject to subsection (A)(4) of
Section VI this subsection (B) shall not (i) prohibit True Temper from
establishing such differences in prices, discounts, rebates, advertising,
or other allowances, or terms or conditions of sale as may be lawful
under the laws of the United States, or (ii) require defendant True
Temper to continue the manufacture of any standard shaft which defendant
True Temper has previously and publicly announced to the trade its
intention to discontinue.

8

(C)  If at any one time defendant True Temper manufactures or
sells special shafts for or to three or more of the defendant club
manufacturers, then, upon the request of any other club manufacturer
in the United States and the submission by such manufacturer of a
firm order in writing for a minimum of 15,000 special shafts of one
grade for woods, or a minimum of 15,000 special shafts of one grade
for irons, which can be manufactured by True Temper's normal and usual
manufacturing methods, such order to be for delivery in lots of not
less than 5,000 shafts, defendant True Temper is ordered and directed
to manufacture special shafts for such club manufacturer upon True
Temper's normal and usual manufacturing and trade terms and conditions
and to schedule the manufacture or production of such special shafts
pursuant to such order in accordance with its normal and usual
scheduling procedures, without any discrimination whatsoever against
any non-defendant club manufacturer, and without offering or affording
to any defendant club manufacturer any preference or priority over a
non-defendant club manufacturer; provided, however, that True Temper
may in good faith reflect in the prices at which such special shafts
are sold any differences in the cost of manufacture, sale, or delivery
of such special shafts.  At any time after five (5) years from the
date of entry of this decree, defendant True Temper may petition the
Court to be relieved of this Section VI(C) or for appropriate modifica-
tion thereof, and such relief shall be granted upon a showing by
defendant True Temper that the relief incorporated in this Section VI(C)

9

is (i) not then necessary or appropriate and (ii) that substantial and effective competition exists in the manufacture and sale of special shafts.

(D)  In the event of the failure, refusal  or inability of defendant True Temper to (i) sell standard shafts to any non-defendant club manufacturer in accordance with the subsection (B) above or to (ii) manufacture and sell to or for any club manufacturer special shafts in accordance with subsection (C) above, defendant True Temper is ordered and directed (i) to advise such non-defendant club manufacturer, by letter, of the specific reason or reasons for such failure, refusal  or inability and (ii) to furnish to the plaintiff a copy of each such letter.  In any suit or proceeding which, at any time, may hereafter be brought or instituted by the plaintiff arising out of, or based upon, any such failure, refusal or inability of defendant True Temper, defendant True Temper is enjoined and restrained from raising any excuse for such failure, refusal  or inability except that specifically stated in such letter to such non-defendant club manufacturer.

### VII

The defendant club manufacturers are each individually enjoined and restrained from directly or indirectly:

(A)  Coercing, compelling, or otherwise seeking to require or induce dealers or jobbers to observe or adhere to such defendant's suggested resale prices for golf clubs manufactured by defendant;

10

provided that each defendant club manufacturer may disseminate to its jobbers or dealers suggested resale prices on golf clubs of its own manufacture if each separate document or paper, or the first inside page of any catalogue, so disseminated and containing or purporting to contain suggested resale prices bears a clear statement, in bold type, on the face thereof, or on such page, to the effect that the prices therein contained are suggested prices only, and are not binding upon any person;

(B)  Hindering, restricting, or preventing, or attempting to hinder, restrict, or prevent any other person from:

(1)  Purchasing any shaft or shafts from any source;

(2)  Selling any shaft or shafts, or golf club or clubs to any third person;

(3)  Manufacturing, selling, or distributing any golf clubs;

(C)  Entering into, adhering to, maintaining, enforcing, or attempting to enforce, any contract, agreement, understanding, plan, or program with any other person to restrict or limit, in any manner, the sale or resale of any particular grade or type of golf club, or any golf club embodying any particular grade or type of shaft, to any particular category or categories of customers or purchasers, or through any particular channel or channels of distribution; except that each defendant club manufacturer may individually and independently elect to sell particular grades or types of golf clubs to particular customers or categories of customers, provided such golf clubs bear

11

the brand name or names of the selling defendant or the purchaser;

(D) Permitting any of its officers, directors, agents, or employees, to serve also, at the same time, in any similar capacity with any other club manufacturer or with defendant True Temper, or permitting any of its officers or directors while so serving to hold or continue to hold, individually or as a group, in excess of one per cent of the outstanding stock of any class or in excess of one per cent of the outstanding debt obligations of any class of any other club manufacturer or of defendant True Temper;

(E) Communicating, in any manner, circulating, or disseminating to any person outside of the defendant's own organization or employ, any price lists or quotations or tentative lists or quotations for the sale of golf clubs, in advance of or prior to, the general publication, circulation, or dissemination of such price lists or quotations to the customers of the defendants and to the trade generally; or

(F) Being a member of, contributing anything of value to, or participating in any of the activities of, any trade association or central agency of or for club manufacturers, jobbers, or dealers, with knowledge, or reasonable grounds to believe, that any of the activities thereof are, or may be, inconsistent with any of the provisions of this Final Judgment;

(G) For a period of five (5) years following entry of this Final Judgment, using any decal, trade, or grade name, mark, or other

designation, owned or controlled by defendant True Temper, on any golf club manufactured or sold by such defendant club manufacturer, provided however that defendant True Temper may mark with its name "True Temper" or its initials "TT," shafts manufactured by it and sold to any defendant club manufacturer if all such shafts sold to defendant club manufacturers are uniformly and inconspicuously so marked.

### VIII

Should defendant True Temper, at any time hereafter, engage in the manufacture or sale of golf clubs, all of the provisions of this Final Judgment applicable to the defendant club manufacturers, except Sections VII(D) and IX shall be equally applicable to defendant True Temper as a golf club manufacturer and True Temper shall be enjoined and restrained from permitting any of its officers, directors, agents, or employees, to serve also, at the same time, in any similar capacity with any other golf club or shaft manufacturer, or permitting any of its officers or directors, while so serving, to hold or continue to hold, individually or as a group, in excess of one per cent of the outstanding stock of any class or in excess of one per cent of the outstanding debt obligations of any class of any other golf club or shaft manufacturer. This provision shall have no effect upon the other provisions of this Final Judgment applicable to defendant True Temper as a shaft manufacturer.

13

## IX

The defendant club manufacturers are ordered and directed to:

(A) Each, independently review, within ninety (90) days after the date of this Final Judgment, its then prevailing prices for golf clubs;

(B) Each, independently and individually, determine its own prices for golf clubs on the basis of its own business judgment and without any consultation with any other defendant or club manufacturer;

(C) Each publish and disseminate to its customers, and the plaintiff, on or before October 15, 1961, a price list or price lists containing the prices determined pursuant to subsection (B) above.

## X

(A) The defendants are ordered and directed to cause a copy of this Final Judgment to be published at least once a month for three (3) consecutive months in the trade magazines Sporting Goods Dealer and Golfdom. The costs of compliance with this subsection (A) shall be borne equally by the defendants.

(B) For a period of five (5) years, the defendants are ordered and directed to furnish a copy of this Final Judgment to any person upon request.

## XI

For the purpose of securing compliance with this Final Judgment and for no other purpose, and subject to any legally recognized privilege, duly authorized representatives of the Department of Justice shall upon written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division, upon reasonable notice to any defendant made to its principal office, be permitted:

(A)  Reasonable access, during the office hours of said defendant to all books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or control of said defendant relating to any of the matters contained in this Final Judgment;

(B)  Subject to the reasonable convenience of said defendant and without restraint or interference from it, to interview the officers and employees of said defendant, who may have counsel present, regarding any such matters.

For the purpose of securing compliance with this Final Judgment, each consenting defendant, upon the written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division, and upon reasonable notice made to its principal office, shall submit such written reports (under oath, if so requested) with respect to any of the matters contained in this Final Judgment as from time to time may be necessary for the enforcement of this Final Judgment.  No information obtained by the means provided in this Section XI shall be divulged by any representative of the Department of Justice to any person

15

other than a duly authorized representative of the Executive Branch of the plaintiff except in the course of legal proceedings to which the United States is a party for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

## XII

Jurisdiction is retained for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment and for the enforcement of compliance therewith and the punishment of the violation of any of the provisions contained herein.


                                    s/ Edwin A. Robson
                                    United States District Judge

We hereby consent to the making and entry of the foregoing Final Judgment.

FOR THE PLAINTIFF

s/  Lee Loevinger
LEE LOEVINGER
Assistant Attorney General

s/ W. D. Kilgore, Jr.
WILLIAM D. KILGORE, JR.

s/ Harry N. Burgess
HARRY N. BURGESS

s/ Baddia J. Rashid
BADDIA J. RASHID

Attorneys, Department of Justice

s/  Earl A. Jinkinson
EARL A. JINKINSON

s/  Willis L. Hotchkiss
WILLIS L. HOTCHKISS

s/  Thomas J. Rooney
THOMAS J. ROONEY

s/  Samuel J. Betar, Jr.
SAMUEL J. BETAR, JR.

Attorneys, Department of Justice

Room 404, United States Courthouse
Chicago 4, Illinois
HArrison 7-4700

FOR THE DEFENDANT TRUE TEMPER CORPORATION

s/ Robert H. Bork
ROBERT H. BORK

s/ Gordon H. S. Scott
GORDON H. S. SCOTT

Kirkland, Ellis, Hodson, Chaffetz & Masters
130 East Randolph Drive
Chicago 1, Illinois

s/ John H. Watson, Jr.
JOHN H. WATSON, JR.
M. B. & H. H. Johnson
Union Commerce Building
Cleveland, Ohio

FOR THE DEFENDANT A. G. SPALDING & BROS., INC.

s/ John T. Chadwell
JOHN T. CHADWELL

s/ Richard M. Keck
RICHARD M. KECK

s/ Richard S. Rhodes
RICHARD S. RHODES

Snyder, Chadwell, Keck, Kayser & Ruggles
135 South LaSalle Street
Chicago 3, Illinois

FOR THE DEFENDANT WILSON ATHLETIC GOODS MFG. CO., INC.

s/ Thomas Freeman
THOMAS FREEMAN

s/ Louis R. Simpson
LOUIS R. SIMPSON

Suite 900, Prudential Plaza
130 East Randolph Drive
Chicago 1, Illinois

17

FOR THE DEFENDANTS MacGREGOR SPORT PRODUCTS, INC.
and HILLERICH & BRADSBY CO.

s/ Miles G. Seeley
MILES C. SEELEY

s/ Erwin C. Heininger
ERWIN C. HEININGER

Mayer, Friedlich, Spiess, Tierney, Brown & Platt
231 South LaSalle Street
Chicago, Illinois

# Appendix 3

BB✦
1402

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CIVIL ACTION |
| Plaintiff, | ) | NO. 58 C 1158 |
| v. | ) | [Equitable Relief Sought] |
| TRUE TEMPER CORPORATION, | ) | [Filed June 30, 1958] |
| Defendant. | ) | |

## COMPLAINT

The United States of America, plaintiff, by its attorneys, acting under the direction of the Attorney General of the United States, brings this action against the defendant and complains and alleges as follows:

### I

### JURISDICTION AND VENUE

1.  This complaint is filed and these proceedings are instituted against the defendant under Section 4 of the Act of Congress of July 2, 1890, c. 647, 26 Stat. 209, as amended, entitled "An Act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the Sherman Act, in order to prevent and restrain continuing violations by the defendant as hereinafter alleged of Sections 1 and 2 of said Act.

2.  The defendant True Temper Corporation transacts business within the Northern District of Illinois, Eastern Division.

II

THE DEFENDANT

3.  True Temper Corporation, sometimes hereinafter referred to as the defendant True Temper, is made a defendant herein.  Said defendant is an Ohio corporation which prior to 1949 operated under the name American Fork & Hoe Co., and has its principal office at 1623 Euclid Avenue, Cleveland, Ohio.  Reference herein made to the defendant True Temper applies also to that corporation as it existed under the name American Fork & Hoe Co.

4.  The acts alleged in this complaint to have been done by the defendant True Temper were authorized, ordered, or done by the directors, officers, agents, employees, or other representatives of the said defendant while acting within the scope of their authority.

III

CO-CONSPIRATORS

5.  Corporations and individuals not named as defendants herein have participated as co-conspirators and as parties to illegal contracts with the defendant True Temper in the offenses hereinafter charged and have performed acts and made statements in furtherance thereof.  Such co-conspirators include but are not limited to the following:

2

(a) Accles & Pollock, Limited, sometimes hereinafter referred
to as the co-conspirator "Accles."  It is incorporated in
Great Britain, with principal offices at Oldbury, England;

(b) British Steel Golf Shafts, Limited, sometimes hereinafter
referred to as co-conspirator "English Sales Company."
It is incorporated in Great Britain with  principal offices
at Oldbury, England, and its stock is held in nearly equal
proportions by the defendant True Temper and the co-conspira-
tor Accles;

(c) Tube Investments, Limited.  It is incorporated in Great
Britain, and it is the parent company of co-conspirator
Accles;

(d) Stewarts & Lloyds Proprietary, Limited.  It is incorporated
in Australia with principal offices at Adelaide, Australia;

(e) British Tube Mills (Australia), Proprietary, Limited, some-
times hereinafter referred to as the "Australian Manufactur-
ing Company."  It is incorporated in Australia and its stock
is held in nearly equal proportions by the co-conspirators
Tube Investments, Limited, and Stewarts & Lloyds Proprietary,
Limited;

(f) Australian Steel Golf Shafts Proprietary, Limited, sometimes
hereinafter referred to as the "Australian Sales Company."
It is incorporated in Australia and its stock is owned by

3



the defendant True Temper and co-conspirators Accles and British Tube Mills (Australia), Proprietary, Limited.

IV

DEFINITIONS

6.  The term "steel shafts" as used herein means tubular steel shafts produced for use as a component part of golf clubs.

7.  The term "True Temper shafts" as used herein means alloy steel shafts of "step down" design produced by the defendant True Temper in the United States, and steel shafts which are produced in England by the co-conspirator Accles and in Australia by the co-conspirator Australian Manufacturing Company in conformity with plans and specifications prescribed by the defendant True Temper for its True Temper shafts.

8.  The term "Apollo shafts" as used herein means straight tapered carbon steel shafts produced by co-conspirator Accles in England and by the co-conspirator Australian Manufacturing Company in Australia bearing the name "Apollo," and which are sold by the co-conspirators English Sales Company and Australian Sales Company, respectively.

9.  The term "Empire Territory" when used herein means the United Kingdom, the British Empire of the territorial extent existing in 1930, and the Continent of Europe.

4

V

TRADE AND COMMERCE

10.  Virtually all golf clubs now produced throughout the world are made with steel shafts.  Golf clubs are made by producers who purchase the required steel shafts from companies which produce such shafts.

11.  During the existence of the hereinafter described illegal contracts, combination, and conspiracy, virtually all steel shafts for golf clubs have been manufactured and sold within the area consisting of the United States and the Empire territory.

12.  The principal producer of steel shafts in the United States and the world is the defendant True Temper, which in 1956 produced approximately 90 per cent (dollar volume) of all of the steel shafts produced and sold in the United States, there now being but one other producer of steel shafts in the United States.  The defendant True Temper produces steel shafts in its plant located at Geneva, Ohio, and ships such shafts in interstate and foreign commerce to numerous golf club manufacturers located in States other than the State of Ohio as well as to purchasers located in foreign countries.  In the year ending April 30, 1957, the True Temper sales of shafts in the United States totalled in excess of $4,800,000 and its sales to foreign customers were approximately $1,200.

5



13.   At the time of the inception of the hereinafter described
illegal contracts, combination, and conspiracy, the defendant True
Temper held certain domestic and foreign patents, since expired, on
alloy steel shafts of step down design, and was the principal producer
of such shafts.

14.   At the time of the inception of the hereinafter described
illegal contracts, combination, and conspiracy, co-conspirator Accles
was the largest producer in the United Kingdom, the British Empire,
and the Continent of Europe of steel shafts, particularly Apollo
shafts, and tubing for making them.

15.   The defendant True Temper receives numerous orders for True
Temper shafts from foreign sources which, pursuant to the hereinafter
alleged combination, conspiracy, and contracts in restraint of inter-
state and foreign trade and commerce, it refuses to fill, and certain
of the co-conspirators receive orders from sources in the United States,
but pursuant to the hereinafter alleged combination, conspiracy, and
contracts in restraint of interstate trade and commerce, refuse to
fill such orders.

VI

### THE COMBINATION, CONSPIRACY, AND CONTRACTS
### IN RESTRAINT OF TRADE

16.   For many years past and continuing to the date of the filing
of this complaint, the defendant True Temper and co-conspirators have
been parties to unlawful contracts and agreements, and have engaged
in an unlawful combination and conspiracy in restraint of and to
monopolize the hereinbefore described interstate and foreign trade and

6

commerce in steel shafts, in violation of Sections 1 and 2 of the Act of Congress of July 2, 1890, c. 647, 26 Stat. 209, as amended (15 U.S.C. §§ 1 and 2), commonly known as the Sherman Act.  Said offenses are continuing and will continue, unless the relief hereinafter prayed for is granted.

17.  The aforesaid combination and conspiracy has consisted of a continuing agreement, understanding, and concert of action among the defendant True Temper and co-conspirators, the substantial terms of which have been and are that they agree:

(a)  That the defendant True Temper make and sell True Temper shafts in the United States but refrain from selling any steel shafts in the Empire territory;

(b)  That the co-conspirator Accles have allocated to it the exclusive right to produce True Temper shafts in England, that it sell such shafts exclusively to the co-conspirator English Sales Company, and that both of such co-conspirators refrain from selling any steel shafts in the United States but have the exclusive right to sell True Temper shafts in the Empire territory subject to special arrangements for Australia;

(c)  That the co-conspirator Australian Manufacturing Company be established and have allocated to it the sole right to produce True Temper shafts in Australia, that it sell exclusively to the Australian Sales Company, and that such Australian Sales Company have the exclusive right to sell True Temper shafts in Australia and refrain from selling steel shafts elsewhere.

18. The unlawful contracts and agreements referred to in paragraph 16 of this complaint embody the terms of the unlawful combination and conspiracy set forth in subparagraphs (a) to (c), inclusive, of the preceding paragraph of this complaint.

19. For the purpose of carrying out the aforesaid unlawful contracts and agreements, and the aforesaid unlawful combination and conspiracy, the defendant and co-conspirators by agreement and concert of action have done the things which, as hereinbefore alleged they conspired and agreed to do.

## VII

### EFFECTS

20. The effects of the aforesaid unlawful contracts, agreements, combination and conspiracy have been, among others, as follows:

(a) The importation of steel shafts, including True Temper shafts, from foreign countries into the United States, has been illegally prevented and restrained;

(b) The exportation from the United States to foreign countries of steel shafts, including True Temper shafts, has been prevented and restrained;

(c) Competition among golf club manufacturers in the United States and elsewhere has been illegally restrained;

(d) Interstate and foreign trade and commerce in the manufacture and sale of steel shafts has been illegally restrained and monopolized in violation of the Sherman Act.

8



VIII

PRAYER

WHEREFORE, plaintiff prays:

1. That the Court adjudge and decree that the aforesaid combination and conspiracy entered into by the defendant True Temper and co-conspirators, and the acts done pursuant thereto, and the unlawful contracts and agreements entered into between such parties were in violation of Sections 1 and 2 of the Sherman Act, and that they be enjoined from further violation of that Act.

2. That the unlawful contracts and agreements entered into between the defendant True Temper and the co-conspirators be declared null and void, and that the defendant True Temper be enjoined from reinstating such contracts or from asserting any rights under them.

3. That the defendant True Temper be required to divest itself of all stock interest it may have in the British Sales Company and the Australian Sales Company and be enjoined from thereafter reacquiring any such stock interest in such companies either directly or indirectly.

4. That the defendant True Temper be enjoined from entering into any agreement, understanding, or concert of action with any foreign producer of steel shafts, wherever located, which has the effect of preventing the importation into the United States of steel shafts made abroad or the exportation to foreign countries of steel shafts made in the United States, or of fixing prices on the sale of steel shafts, wherever produced.

5. That the plaintiff have such other, further and different relief as the nature of the case may require and the Court may deem appropriate in the premises.

9

6. That the plaintiff recover the costs of this suit.

s/    William P. Rogers
    WILLIAM P. ROGERS
    Attorney General


s/    Victor R. Hansen
    VICTOR R. HANSEN
  Assistant Attorney General


s/  George H. Schueller
    GEORGE H. SCHUELLER
Attorney, Department of Justice


s/    R. Tieken
    R. TIEKEN
  United States Attorney

s/    Earl A. Jinkinson
    EARL A. JINKINSON


s/    Willis L. Hotchkiss
    WILLIS L. HOTCHKISS


s/    Thomas J. Rooney
    THOMAS J. ROONEY


s/    John R. Reilly
    JOHN R. REILLY


s/    Samuel J. Betar, Jr.
    SAMUEL J. BETAR, JR.

Attorneys, Department of Justice

Room 404, United States Courthouse
Chicago 4, Illinois
HArrison 7-4700

# Appendix 4

*BBF*
*1401*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **CIVIL ACTION** |
| v. | ) | |
| | ) | No. 58 C 1159 |
| TRUE TEMPER CORPORATION; | ) | |
| WILSON ATHLETIC GOODS MFG. | ) | Equitable Relief Sought |
| CO., INC.; A. G. SPALDING | ) | (15 U.S.C. §§ 1 and 2) |
| & BROS., INC.; Mac GREGOR | ) | |
| SPORT PRODUCTS, INC.; and | ) | [Filed June 30, 1958] |
| HILLERICH & BRADSBY CO., | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

The United States of America, by its attorneys, acting under the direction of the Attorney General, brings this complaint against the defendants named herein, and alleges as follows:

I

### JURISDICTION AND VENUE

1. This complaint is filed and these proceedings are instituted against the defendants named herein under Section 4 of the Act of Congress of July 2, 1890, c. 647, 26 Stat. 209, as amended (15 U.S.C. § 4), entitled "An Act to protect trade and commerce against unlawful restraints and monopolies", commonly known as the Sherman Act, in order to prevent and restrain continuing violations by the defendants, as hereinafter alleged, of Sections 1 and 2 of that Act (15 U.S.C. §§ 1 and 2).

2.  The defendant Wilson has its principal office in and is found and transacts business within the Northern District of Illinois, Eastern Division, and the other defendants transact business therein.

## II

### THE DEFENDANTS

3.  The following are named as defendants herein:

(a)  <u>True Temper Corporation</u> (True Temper)

This is an Ohio corporation which, prior to 1949, operated under the name American Fork & Hoe Co.  Its principal office is at 1623 Euclid Avenue, Cleveland, Ohio.  It is engaged, among other things, in the manufacture of steel shafts for golf clubs.  Reference herein made to the defendant True Temper applies also to that corporation as it existed under the name American Fork & Hoe Co.

(b)  <u>Wilson Athletic Goods Mfg. Co., Inc.</u> (Wilson)

This is a Delaware corporation which is an almost wholly owned subsidiary of Wilson & Co., Inc., meat packers, and has its principal offices at 2233 West Street, River Grove, Illinois.  It is engaged, among other things, in the production of golf clubs.

(c)  <u>A. G. Spalding & Bros., Inc.</u> (Spalding)

This is a Delaware corporation whose main office is at Chicopee, Massachusetts.  It is engaged, among other things, in the production of golf clubs.

2

MacGregor Sport Products, Inc. (MacGregor)

This is an Ohio corporation whose principal office is at 4861 Spring Grove Avenue, Cincinnati, Ohio. It is engaged, among other things, in the production of golf clubs. Its subsidiaries include The MacGregor Co. and the MacGregor Golf Company, Inc., through which certain of its operations are conducted.

(e) Hillerich & Bradsby Co. (H & B)

This is a Kentucky corporation whose principal office is at 436 East Finger Street, Louisville, Kentucky. It is engaged, among other things, in the production of golf clubs.

The foregoing corporate defendants, other than the defendant True Temper, will sometimes hereinafter be referred to collectively as the "big four defendants."

4. The acts alleged in this complaint to have been done by each corporate defendant were authorized, ordered, or done by the officers, directors, agents, employees, or other representatives of such corporate defendant while acting within the scope of their authority.

III

CO-CONSPIRATORS

5. Corporations and individuals not named as defendants herein have participated as co-conspirators with the defendants in the offenses hereinafter charged and have performed acts and made statements in furtherance thereof. Such co-conspirators include but are not limited to those corporations and individuals other than the defendants Wilson,

3

Spalding, MacGregor, and H & B, which purchased steel golf shafts from True Temper subject to the requirement that minimum "lowdown" prices be maintained on the sale of golf clubs.

IV

DEFINITIONS

6. The term "steel shafts" as used herein means tubular steel shafts produced for use as a component part of golf clubs.

7. The term "True Temper shafts" as used herein means alloy steel shafts of "step down" design produced by the defendant True Temper. There are two categories of such shafts:

> (a) Most True Temper shafts are banded with a decal or other device to identify the shafts as having been produced by the defendant True Temper, and to show further the grade name of the shaft, such as "Pro-Fit", "Dynamic", "Rocket", "Meteor", or "Century". The shafts thus identified will be referred to sometimes herein as "True Temper banded shafts."

> (b) True Temper shafts without any decal or other insignia identifying them as having been produced by the defendant True Temper or indicating any grade, will be referred to herein sometimes as "True Temper unbanded shafts."

8. The term "pro shops" as used herein means shops where golfing equipment is sold at retail, which are operated in connection with golf courses or driving ranges and are usually managed or operated by the golf professional attached to such course or driving range. Sales of golf clubs by golf club manufacturers to such shops will sometimes hereinafter be referred to as "pro sales."

4

9. The term "lowdown price" as used herein means the minimum wholesale price at which the manufacturer of golf clubs sells the various grades of such clubs to retailers such as department stores, sporting goods stores, mail order houses, or pro shops.

## V

### TRADE AND COMMERCE

10. Virtually all golf clubs produced in the United States are made with steel shafts. Such steel shafts are produced by shaft manufacturers, including the defendant True Temper, who ship them in interstate trade and commerce to golf club manufacturers, most of whom are located in States other than the ones in which the companies producing the steel shafts are located. The golf club manufacturers then incorporate the steel shafts into the golf clubs manufactured by them and distribute the completed golf clubs throughout the United States in two main merchandising channels: (a) pro shops, and (b) commercial establishments such as department stores, sporting goods stores, mail order houses and the like, which sell golf clubs at retail.

11. The True Temper shafts are produced in a plant located at Geneva, Ohio, and are shipped from there to golf club manufacturers located in numerous other States.

12. There are approximately sixty corporations, partnerships, and individual entrepreneurs in the United States which produce golf clubs. Their sale of golf clubs in 1956 amounted to approximately thirty-one million dollars (wholesale). The sales of the defendants Wilson, Spalding, MacGregor, and H & B accounted for nearly twenty-five million dollars or approximately 80 per cent of the golf club

5

sales of all of the manufacturers. The sales (wholesale) of the big

four defendants in 1956 were approximately as follows:

| | |
|---|---|
| Wilson | $11,138,000 |
| Spalding | 6,600,000 |
| MacGregor | 5,506,000 |
| H & B | 1,747,000 |
| Total big four | $24,991,000 |

The remaining approximately 56 producers had sales (wholesale) of

approximately $6,500,000, of which eleven medium sized producers

accounted for approximately $5,500,000 or 17 per cent of the total

sales while forty-five smaller producers accounted for approximately

$1,000,000 or 3 per cent of the total.

13.  Prior to and immediately after World War II, there were four

leading producers of steel shafts in the United States of whom the

defendant True Temper was the principal producer, accounting for

approximately 70 per cent of total sales in 1947.  The True Temper

shafts had by 1947 gained wide acceptance, particularly for the high

grade, high priced lines of golf clubs such as were sold to pro shops.

True Temper made, however, shafts not only for such clubs, but also

for the so-called "competitive" clubs which sold at lower prices

principally through such channels as department and sporting goods

stores, and mail order houses.  The steel shafts manufactured by

competitors of True Temper were used mostly in the lower priced grades

of clubs.

14.  By 1957, only one manufacturer other than True Temper

remained in the business of producing steel golf shafts in the United

States.  By then the golf shaft sales of the defendant True Temper

6

amounted to slightly over $5,000,000 and accounted for approximately 90 per cent of the dollar volume of all sales of steel shafts. The True Temper shafts had gained such wide acceptance, particularly for the higher quality of golf clubs such as those usually sold in pro shops, that a golf club manufacturer desiring to make and sell such higher quality clubs would have major difficulty in gaining acceptance for his clubs unless they were equipped with True Temper banded shafts.

15.  The big four defendants are the principal customers of the defendant True Temper and their purchases account for approximately 83 per cent of True Temper's total sales of steel shafts. Ten medium sized golf club producers account for 15 per cent of True Temper's shaft sales and forty-three smaller producers account for 2 per cent of its total sales.

16.  The defendant True Temper manufactures several grades of True Temper banded shafts as well as a grade which is unbanded. There is a substantial variation in the price which True Temper charges any given category of customers for the various grades. The True Temper banded shaft made for clubs to be sold to pro shops exclusively is sold at the highest price while the unbanded shaft is sold at the lowest price. There is, however, very little difference, and in some cases none, in True Temper's manufacturing cost of producing the various grades of shafts as designated for particular clubs such as woods, irons, or putters.

17.  Prior to World War II, the big four defendants bought from True Temper most of their requirements of shafts intended for use in clubs to be sold to pro shops as well as the higher priced, high quality

7

clubs sold through the so-called commercial channels, but they purchased from competitors of True Temper large quantities of steel shafts for use in the lower priced commercial lines of clubs. After World War II, the big four defendants began purchasing all of their requirements of steel shafts, including unbanded ones intended for the lowest price of "competitive" golf clubs, from True Temper exclusively.

VI

THE COMBINATION AND CONSPIRACY

18.    For many years past and continuing to the date of the filing of this complaint, the defendants herein and co-conspirators have engaged in a combination and conspiracy in unreasonable restraint of the aforesaid interstate trade and commerce in steel golf shafts and golf clubs, and to monopolize for the defendant True Temper the hereinbefore described interstate trade and commerce in the manufacture and sale of steel shafts and to monopolize for the big four defendants the hereinbefore described interstate trade and commerce in the manu-facture and sale of golf clubs, in violation of Sections 1 and 2 of the Act of Congress of July 2, 1890, c. 647, 26 Stat. 209, as amended (15 U.S.C. §§ 1 and 2), commonly known as the Sherman Act. Those offenses are continuing and will continue, unless the relief hereinafter prayed for is granted.

19.    The aforesaid combination and conspiracy has consisted of a continuing agreement, understanding, and concert of action among the defendants, the co-conspirators, and others to the plaintiff unknown, the substantial terms of which have been and are that:

(a)    The big four defendants fix and determine lowdown prices for golf clubs graded according to the several grades

8

of True Temper banded shafts incorporated in them, and convey
the agreed upon prices to the defendant True Temper;

(b)  True Temper communicate the aforesaid lowdown prices
to each of its customers for True Temper banded shafts, require
each customer to agree to adhere to such lowdown prices as a
minimum, police such prices to insure that each customer is
adhering to the agreement relating to the minimum lowdown
prices, and refuse to sell True Temper banded shafts to any
golf club manufacturer failing to adhere to such lowdown prices;

(c)  The big four defendants seek to exclude competitors of
True Temper from the business of making steel shafts by refusing
to purchase steel shafts from such competitors of True Temper
and by purchasing from True Temper all of their requirements
of steel shafts;

(d)  True Temper refuse to sell True Temper banded shafts
to any golf club manufacturer who is disapproved by one or more
of the big four defendants;

(e) .True Temper grant to the big four defendants special
preferential prices, discounts, and allowances on their purchase
of True Temper steel shafts and charge higher prices to all other
customers;

(f)  True Temper designate one of its grades of True Temper
banded shafts as being its top grade shaft; the big four defendants
and other customers of True Temper agree to use such shaft in
golf clubs to be sold to pro shops exclusively; and True Temper
refuse to sell such shaft to any golf club manufacturer not
adhering to this restriction;

9

(g) True Temper refuse to make specially designed steel

shafts to the order of any customer except with the approval of

the big four defendants; and such big four defendants refuse

to introduce glass shafts for golf clubs unless all of the

big four defendants adopt such new type shaft simultaneously.

20.  In effectuating and carrying out the aforesaid combination and

conspiracy the defendants and co-conspirators have by agreement,

understanding, and concert of action done the things which as hereinbefore

alleged they combined and conspired to do.

VII

EFFECTS

21.  The effects of the aforesaid combination and conspiracy,

among other things, have been and are:

(a)  Price competition among golf club manufacturers in

the sale of golf clubs has been eliminated or severely limited

and purchasers of golf clubs have been denied the benefit of

such competition, in restraint of interstate trade and commerce;

(b)  Competitors of the defendant True Temper have been

unlawfully foreclosed from the opportunity of competing in

important markets for steel shafts and the defendant True

Temper has been enabled by means of the aforesaid combination

and conspiracy to monopolize the business of manufacturing

and selling steel shafts;

(c)  Competitors and potential competitors of the big

four defendants have been unlawfully foreclosed from the

opportunity of effectively competing with the big four

10

defendants in the manufacture and sale of ⬤f clubs and the

said big four defendants have by virtue of the aforesaid

combination and conspiracy been enabled to monopolize the

manufacture and sale of such golf clubs;

(d)  Competition in the development of new types of

golf shafts, particularly glass golf shafts, and in the

merchandising of golf shafts and golf clubs has been

unlawfully restrained.

PRAYER

WHEREFORE, plaintiff prays:

1.  That the Court adjudge and decree that the aforesaid combination

and conspiracy and the acts done pursuant thereto were in unlawful

restraint of and to monopolize interstate trade and commerce in violation

of Sections 1 and 2 of the Sherman Act.

2.  That the defendants be enjoined from continuing the combination

and conspiracy hereinbefore alleged and from entering any combination,

conspiracy, agreement, understanding, or concert of action having

similar purposes or effects.

3.  That the defendant True Temper be enjoined from requiring,

proposing, or suggesting:

(a)  That any manufacturer, wholesaler, or retailer of

golf clubs publish, announce, enforce, or adhere to certain

prices;

(b)  That any specified grade, quality, or name of True

Temper shaft be used by any golf club manufacturer only in

clubs to be sold within specified or suggested price or grade

11

categories or be sold only to specified recommended customers, categories of customers, or through specified or recommended merchandising channels;

(c)  That any golf club manufacturer purchase its requirements of steel or other golf club shafts from True Temper exclusively;

(d)  That any golf club manufacturer refrain from using and introducing glass shafts, or private brand shafts, or refrain from introducing its clubs except at a time or under conditions concurred in by other manufacturers.

4.  That the defendant True Temper be enjoined from granting discriminatory price discounts, rebates, credits, or allowances on its shafts to any of its customers or groups of customers.

5.  That the defendant True Temper be ordered:

(a)  To publish its prices, terms, and conditions for sales of its shafts; and

(b)  To sell its shafts to any and all customers or groups of customers on a non-discriminatory basis.

6.  That each of the big four defendants and the defendant True Temper be enjoined:

(a)  From communicating, consulting, or agreeing among themselves or with others upon:

(1)  The establishment, recommendation, suggestion, or enforcement of uniform golf club prices, on the wholesale level or on the retail level of distribution;

12

(2) The uniform use or non-use of particular

types or styles of golf club shafts;

(3) Restricting the sale of particular grades

of golf clubs, or clubs embodying particular

shafts, to particular categories of customers

or through particular merchandising channels;

(4) A uniform time or season for the introduction

of new models, types, or styles of golf clubs.

(b) From in any manner coercing, compelling, inducing, or

requiring resellers of golf clubs to adhere to suggested or

mandatory minimum resale prices on such golf clubs.

7.   That the plaintiff have such other, further, and different relief

as the nature of the case may require and the Court may deem appropriate

in the premises.

8.   That the plaintiff recover the costs of this suit.

<table>
<tr><td>

s/ William P. Rogers
WILLIAM P. ROGERS
Attorney General

</td><td>

s/ Earl A. Jinkinson
EARL A. JINKINSON

</td></tr>
<tr><td>

s/ Victor R. Hansen
VICTOR R. HANSEN
Assistant Attorney General

</td><td>

s/ Willis L. Hotchkiss
WILLIS L. HOTCHKISS

s/ Thomas J. Rooney
THOMAS J. ROONEY

</td></tr>
<tr><td>

s/ George H. Schueller
GEORGE H. SCHUELLER
Attorney, Department of Justice

</td><td>

s/ John R. Reilly
JOHN R. REILLY

s/ Samuel J. Betar, Jr.
SAMUEL J. BETAR, JR.

</td></tr>
<tr><td>

s/ R. Tieken
R. TIEKEN
United States Attorney

</td><td>

Attorneys, Department of Justice

Room 404, United States Courthouse
Chicago 4, Illinois
HArrison 7-4700

</td></tr>
</table>

# Appendix 5



**Appendix 3**

# 𝔇𝔢𝔭𝔞𝔯𝔱𝔪𝔢𝔫𝔱 𝔬𝔣 𝔍𝔲𝔰𝔱𝔦𝔠𝔢

FOR IMMEDIATE RELEASE
FRIDAY, APRIL 27, 1984

AT
202-633-2016

The Department of Justice today issued a policy statement concerning the enforcement and review of outstanding judgments in government civil antitrust cases.

The statement advises that, effective May 1, 1984, the Antitrust Division will lodge in its litigating sections and field offices direct responsibility for both the enforcement of the approximately 1500 existing judgments -- which include consent decrees and also the injunction's resulting from trials -- and the review of those judgments for possible modification or termination.

The statement further advises that the Antitrust Division expects defendants and others bound by outstanding judgments to comply with their terms scrupulously.

The Division will periodically conduct inquiries to determine judgment compliance, and will initiate criminal or civil contempt proceedings to deal with violations.  The Division encourages persons with knowledge of possible judgment violations to contact its Office of Operations, Room 3214, Main Building, Department of Justice, Washington, D.C.  20530.  Such communications will be accorded confidential treatment.

(MORE)

- 2 -

The statement also confirms that the Antitrust Division will
continue its program of considering for possible modification or
termination judgments that may have become anticompetitive or for
other reasons may no longer be in the public interest.  Defendants
who believe that their judgments ought to be modified or terminated
should contact the Division's Office of Operations and furnish
the type of information that the Division needs in order to
evaluate such requests, as spelled out in the policy statement.

J. Paul McGrath, Assistant Attorney General in charge of the
Antitrust Division, explained that the transfer of judgment
responsibility to the Division's litigating sections and field
offices will complete a process of decentralizing the Division's
judgment activity which began in late 1982 when the Division's
Judgment Enforcement Section was dissolved and judgment
responsibility was divided on an interim basis among other
sections.

McGrath emphasized that the Division is committed to
enforcing compliance by judgment defendants, and others bound to
outstanding judgments, with the terms of those judgments.  When
the Division obtains evidence of a violation, he said, it will in
appropriate cases bring criminal contempt proceedings.  McGrath
noted that in 1983 a criminal contempt proceeding was brought
against H.P. Hood, Inc., for violating the terms of a 1981
consent decree.  Hood did not dispute the charges and was fined
in excess of $100,000.

(MORE)

- 3 -

McGrath further emphasized that it continues to be the Division's policy to review for possible termination or modification existing judgments that, with the passage of time and as a result of changed legal or factual circumstances, have now become anticompetitive or for other reasons may no longer be in the public interest.

McGrath said this program, initiated in 1981, has proven successful in identifying judgments that unduly restrict legitimate competitive activity and are no longer justified.

Since 1981 some 400 outstanding judgments have been reviewed for possible termination or modification.  Seventeen have been terminated or modified and five others are the subject of pending judicial proceedings looking towards termination.

A copy of the policy statement is attached.

# # # #

Statement of Policy by the Antitrust Division Regarding
Enforcement and Review of Permanent Injunctions Entered in
Government Antitrust Cases

Effective May 1, 1984, the Antitrust Division will lodge in
its litigating sections and field offices direct responsibility
for the enforcement of permanent injunctions (hereinafter
referred to as "judgments") entered in antitrust actions
brought by the Department of Justice, and for the review of
such judgments for possible modification or termination.

The Antitrust Division expects defendants and others bound
by outstanding judgments to comply with their terms
scrupulously. The Division will periodically conduct inquiries
to determine judgment compliance, and will initiate criminal or
civil contempt proceedings to deal with violations. Persons
who have reason to believe that judgment violations may have
occurred are encouraged to contact the Division's Office of
Operations, Room 3214, Main Building, Department of Justice,
Washington, D.C. 20530. Such communications will be accorded
confidential treatment.

The Division recognizes that, with the passage of time and
as a result of changed legal or factual circumstances, existing
judgments may become anticompetitive or for other reasons no
longer be in the public interest. The Division seeks to
identify such outdated judgments, and in appropriate cases will
consent to court applications by defendants to modify or
terminate them, particularly where the judgments in question
unnecessarily or unduly restrict otherwise legitimate
competitive activity. Judgment defendants who believe that
their judgments ought to be terminated or modified should so
inform the Division, through the Office of Operations, and
provide to the Division:

    (1)    a detailed explanation as to (a) why the judgment in
            question should be vacated or modified, including
            information as to changes of circumstances or law that
            make the judgment inequitable or obsolete, and (b) the
            actual anticompetitive or other harmful effect of the
            judgment;

    (2)    a statement of the changes, if any, in its method of
            operations or doing business that the defendant
            contemplates in the event the judgment is modified or
            vacated; and

(3)　a commitment to pay the costs of publication of public
　　　notice of the termination or modification proceedings
　　　in the trade and business press, as the Division may
　　　determine to be appropriate.

DOJ-194404

# Appendix 6


This document is available in two formats: this web page (for browsing content) and PDF (comparable to original document formatting).



# Department of Justice

---

FOR IMMEDIATE RELEASE
TUESDAY, APRIL 13, 1999
WWW.USDOJ.GOV

AT
(202) 514-200
TDD (202) 514-188

## DEPARTMENT OF JUSTICE ANNOUNCES NEW PROTOCOL TO EXPEDITE REVIEW PROCESS FOR TERMINATING OR MODIFYING OLDER ANTITRUST DECREES

WASHINGTON, D.C. — The Department of Justice's Antitrust Division today announced a new protocol designed to expedite the review process for parties seeking to terminate or modify outstanding consent decrees. The protocol is effective immediately.

The new protocol is a voluntary procedure which can be utilized by parties seeking to modify or terminate consent decrees that do not contain an automatic termination provision. Most consen decrees entered into before 1980 do not contain such provisions.

A consent decree cannot be terminated or modified except by court order. Prior to making a recommendation to the court, the Division must determine the probable effects of termination or modification on the market at issue in order to make an informed representation to the court tha the requested order is in the public interest.

In the past, when the Division has agreed to support termination or modification, it has taken or average about two years between the party's initial request and the filing of the motion. The nev protocol is designed to enable parties to expedite the Antitrust Division's review by getting needed information to the Division more quickly.

The new protocol differs from the present decree review process in three ways. First, the party seeking termination or modification will provide its request with the specific information that the Division would normally gather in the course of its review. Having the requesting party provide this material when it makes its request, rather than having the Division later request the information, is expected to reduce the time needed for the Division to act on the request. (Please see Attachment)

Second, the requesting party will contact other defendants bound by the decree and inform them of its intentions. Early involvement by all defendants will further streamline the review process.

Third, at the time the Division opens its review, the requesting party will agree to publish, at its own expense, notice of its intent to seek termination or modification and invite interested parties to provide the Division with relevant information. In determining what notice is appropriate at this stage, the Division will consider the cost of notice to the requesting party. This notice will not replace the notice and comment period that occurs after the motion to terminate or modify is filed with the court. Rather, the intent is that the additional pre-filing publication will cause any interested parties to come forward earlier in the process so that their concerns may be considered and addressed prior to the filing of a motion. The Division will take into account both concerns that are brought to its attention and appropriate inferences that might be drawn if no substantial concerns are raised at that time.

### 

99-131

## ATTACHMENT

### INFORMATION TO BE PROVIDED WITH
### REQUESTS THAT THE ANTITRUST DIVISION
### SUPPORT TERMINATION OR MODIFICATION OF CONSENT DECREES

1. The identity of the party making the request, its representative for purposes of the request, and the decree that is subject to the request; also the date of the decree's entry and the specific action requested (e.g., termination of the entire decree or a specific modification).

2. Confirmation that the party making the request has not been found in violation of the decree and is not aware of any ongoing decree violation or investigation by the FTC or the Antitrust Division into activities subject to the decree.

3. A statement of the reasons for the request, which may include any factors that the party making the request believes are relevant to the public interest, and which should include the following:

  A. Any legitimate business activities that may be prohibited or impeded by the decree.

  B. Any aspects of the decree that the party believes do not promote competition or the public interest.

  C. Any other burdens, costs or other adverse effects that the decree imposes on the party making the request or on others.

  D. Any changes in the factual circumstances relating to the decree, including changes in any relevant market covered by the decree.

  E. Any relevant changes in the law.

  F. An explanation of why, or to what extent, termination or modification of the decree would not undermine the purposes of the decree.

4. A description of how the party would change its manner of doing business if the decree were terminated or modified.

5. Copies where applicable, of the party's most recent annual report, financial statement, and SEC Form 10-K.

6. Copies of the party's most recent business, marketing, or strategic plans for any product covered by the decree.

7. The identity (including the name of a contact person, with telephone number and address) of all significant competitors; the party's ten largest customers; and, if appropriate, the party's ten largest suppliers, for each product or service affected by the decree.

8. The identity of any intellectual property at issue in the decree and any licenses pertaining to that intellectual property, together with the expiration or termination date of the intellectual property and any licenses to it.

# Appendix 7



# Department of Justice

FOR RELEASE AT 4 P.M.
THURSDAY, SEPTEMBER 9, 1982

REMOVING THE JUDICIAL FETTERS:
THE ANTITRUST DIVISION'S
JUDGMENT REVIEW PROJECT

Remarks by

JEFFREY I. ZUCKERMAN
Special Assistant to the
Assistant Attorney General
Antitrust Division

Before the

Council on Antitrust and Trade Regulation
of the Federal Bar Association

Hyatt Regency Hotel
Crystal City, Virginia

September 9, 1982

It is my pleasure to be here today to discuss with you
the Antitrust Division's Judgment Review Project--our systematic
review of the over 1300 judgments that have been entered in
Government civil antitrust actions since 1890 and which
remain in effect today.

The basic mission of the Antitrust Division is to preserve
and promote "free and unfettered competition as the rule of
trade." 1/  Success in this mission should yield, in the
eloquent words of the Supreme Court, "the best allocation of
our economic resources, the lowest prices, the highest quality
and the greatest material progress, while at the same time
providing an environment conducive to the preservation of our
democratic political and social institutions." 2/

We try to eliminate fetters upon competition in whatever
form we find them.  For example, if competitors agree to
restrain competition by fixing prices or restricting output,
we prosecute the firms under the Sherman Act.  Where a proposed
rule or administrative action by a regulatory agency would
unnecessarily constrain competition, we seek to persuade the
agency not to issue the rule or take the action.  When Congress
is considering legislation that would unnecessarily reduce
competition, we argue against enactment of the proposal.

---

1/   Northern Pac. Ry. v. United States, 356 U.S. 1, 4 (1958).

2/   Id.

To the extent that injunctions entered in antitrust actions go beyond enjoining behavior which is per se illegal, they restrain competition to some degree. A key goal of the Judgment Review Project is to identify injunctions that are today unnecessarily restraining competition, and to secure their modification or termination, as appropriate.

There are essentially two reasons why an antitrust decree may contain provisions whose effects today are unreasonably anticompetitive. First, decree provisions that were perfectly sensible and desirable when entered can be unreasonable today if they have been successful in promoting competition where there previously was none. When rival firms agree to restrain competition among themselves, there are usually elements of their agreed upon behavior that would not be unlawful if undertaken independently by one or more of the firms. Where the Department of Justice is able to secure injunctive relief against the parties to such an unlawful agreement, we often seek to bar the continuation of all the practices that were part of the conspiracy, including those which would be unobjectionable if independently pursued. The purposes of enjoining otherwise legitimate behavior are (1) to make it impossible for the parties to continue their conspiracy through a tacit agreement to conduct their business as in the past, and (2) to force them into thinking and acting independently.

- 2 -

Prohibiting lawful competitive behavior may, of course, preclude the realization of certain benefits that flow from "free and unfettered competition," but this welfare loss is outweighed by the gain achieved from ending the collusion. With time, however, if the collusion ends, no further benefit remains to be gained from the injunctive restraints upon otherwise legitimate competitive behavior, but the losses continue. Accordingly, relaxation of the restraints then becomes appropriate and the Division will seek their termination.

Similarly, when a single firm unlawfully monopolizes a market, its behavior will include predatory practices as well as reasonable and lawful conduct. The Department has often sought to enjoin both the predatory practices and some of the otherwise lawful conduct in a deliberate effort to weaken the monopolist and thus encourage new entry. With time, if entry occurs, there remains no reason to restrain the former monopolist from engaging in legitimate competitive behavior. And if no entry occurs, then the restraints are not serving their intended purpose, but operate only to make the defendant an inefficient monopolist—which is even worse than an efficient one.

A decree may also unreasonably restrain competition today if its provisions were a mistake from the outset. Our under-standing of industrial organization and the dynamics of competition has improved markedly in recent decades. Many

- 3 -

older decrees reflect economic theories that we now realize
were mistaken. The Supreme Court itself has recognized the
errors inherent in some past antitrust theories. Probably
the best known example is the Court's action in GTE Sylvania, 3/
replacing the per se ban on exclusive territories articulated
in Schwinn 4/ with a rule of reason approach. Similarly,
Fortner II 5/ reflected a far better analysis--howbeit not
perfect--of the competitive effects of tie-ins than had
previously been displayed in Supreme Court opinions, including
the Court's opinion eight years earlier in the same case. 6/

Notwithstanding these very salutary developments in
judicial interpretation of the antitrust laws, decrees entered
on the basis of misguided and now universally rejected theories
remain in effect. These decrees bar firms from engaging in
behavior that, if engaged in by their competitors, would be
subject to rule of reason analysis and, more often than not,
be found reasonable and lawful. It seems obvious to me that
decrees restraining perfectly reasonable competitive behavior
for no good reason should be terminated.

---

3/    Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36
(1977).

4/    United States v. Arnold, Schwinn & Co., 388 U.S. 365 (1967).

5/    United States Steel Corp. v. Fortner Enterprises, Inc.,
429 U.S. 610 (1977).

6/    Fortner Enterprises, Inc. v. United States Steel Corp.,
394 U.S. 495 (1969).

- 4 -

Elimination of these judicial fetters upon competition
is not the only goal of our Judgment Review Project. We
also expect that as a result of the Project, the Division
will be better able to enforce decrees which do promote
competition. The universe of decrees requiring enforcement
attention is not, however, defined simply as those decrees
that do not affirmatively restrain competition. For example,
there are decrees to which no one is subject because all the
parties are dead individuals, or defunct firms that have no
successors. There are also decrees that have expired by
their terms, such as those which mandated the divestiture of
certain assets and nothing more. Obviously, these judgments
do not restrain competition, but neither do they merit any
enforcement attention. We are noting these decrees as we
encounter them in our review, and putting them into our
institutional dead letter file.

There are also decrees that add nothing to the general
antitrust laws; they only enjoin conduct which would, and
should, constitute a _per se_ violation of the antitrust laws.
In days gone by, these types of decrees served certain very
useful functions. The maximum penalty for violation of the
Sherman Act, then a misdemeanor, was a $50,000 fine and
imprisonment for one year. 7/ But if a person subject to an
injunction against, for example, horizontal price fixing

_____

7/   15 U.S.C. § 1 (1970) (amended 1974).

- 5 -

violated the decree, it would have been subject to much
greater penalties through criminal contempt proceedings.   In
1974, however, as part of the Antitrust Procedures and Penalties
Act, 8/ Congress amended the Sherman Act to make its violation
a felony, to allow the imposition upon corporate violators
of fines up to $1,000,000, and to authorize fines up to
$100,000 and imprisonment up to three years for individuals.
It is unlikely, barring special circumstances, that a
court today would impose any greater penalty for violation
of a fifty-year-old injunction against horizontal price
fixing than it would impose in a criminal proceeding under
the Sherman Act.

    Perpetual injunctions against per se unlawful behavior,
through their visitation clauses, also once provided the
Antitrust Division with a means to obtain information that
might not otherwise have been available.  Enactment in 1962
of the Antitrust Civil Process Act, 9/ which authorized us
to issue civil investigative demands, and the subsequent
improvement of this investigative tool by the Hart-Scott-Rodino
Antitrust Improvements Act of 1976, 10/ reduced the need for
perpetual visitation rights.

---

8/   Pub. L. No. 93-528, § 3, 88 Stat. 1706, 1708 (1974).

9/   Pub. L. No. 87-664, 76 Stat. 548 (1962).

10/  Pub. L. No. 94-435, §§ 101-106, 90 Stat. 1383 (1976).

- 6 -

Recognizing that, as a general rule, perpetual decrees against per se unlawful behavior eventually cease to have any deterrent effect beyond that of the antitrust laws in general, the Antitrust Division, some 3 1/2 years ago, adopted a policy of generally limiting consent decrees to a term of ten years. As part of our current review, we are identifying the earlier "per se decrees"--decrees that enjoin only behavior which is, and should be, per se unlawful.

We are not at this time planning to seek the termination of all these decrees, because this would be, in many cases, an unnecessary use of our resources. If, however, a party to such a decree wishes to move its termination, and has some plausible and legitimate reason, we would be inclined to consent to the motion. There will, however, be exceptions to this policy. For example, through our review we are identifying certain firms and industries that seem to have a proclivity toward price fixing. We would be inclined to oppose the termination of per se decrees against such firms or in such industries, particularly if the structure of the market remains conducive to cartel behavior. If the parties were to engage in price fixing again, we would consider bringing a criminal contempt proceeding and asking the court to impose stiffer penalties than those permitted under the Sherman Act, so as to root out the parties' recidivist tendencies.

- 7 -

Once the decrees that unnecessarily restrain competition
are terminated, and those that have expired or which otherwise
have no competitive effect are identified, the remainder should
be decrees that affirmatively promote competition. We intend
to monitor closely compliance with those judgments, and to
enforce them vigorously. We intend also to keep a close
watch on the recidivist firms and industries that we identify.
Our review has already prompted a few enforcement investiga-
tions, and we expect that more will follow. We are also about
to.implement a new computerized system for monitoring judgment
compliance, which will strengthen our enforcement capabilities.

While I am on the subject of our enforcement intentions,
I should also warn defendants against unilaterally deciding
that a particular decree provision is anticompetitive and
then proceeding to violate it on the assumption that we would
not care. If we were to discover such patently contumacious
behavior, we would consider bringing a criminal contempt action,
even if we agreed that the decree should be terminated. I
probably need not remind any of you that a court order remains
in effect until the court terminates it. We urge that any
party which is being restrained from competing by an injunction
in a Government antitrust action write to us and call the
situation to our attention. We are anxious to remove unreason-
able injunctive restraints, and we are prepared to review
decrees quickly where appropriate and necessary. We cannot,
however, countenance contempt of court.

- 8 -

Finally, I would like to say a word about the procedures we are employing in connection with judgment modifications and terminations. In most cases, the motion to modify or terminate is made by the defendant(s). At the same time as the motion is filed, the parties file a stipulation in which the defendant agrees to publish notice of its motion in two consecutive issues of the national edition of <u>The Wall Street Journal</u> and in two consecutive issues of the trade journal(s) most likely to be read by persons interested in the market(s) affected by the judgment. The notice (1) summarizes the complaint and the judgment; (2) explains where copies of all the relevant papers can be inspected (in most cases, at the offices of the Antitrust Division and of the clerk of the court where the motion was filed); (3) states that copies of the papers can be obtained from the Antitrust Division, upon request and payment of the copying fees prescribed by Justice Department regulations; and (4) invites all interested persons to send comments concerning the proposed modification or termination to the Antitrust Division during the next sixty days.

The stipulation also contains the Division's consent to modification or termination of the decree, but provides that the court will not rule upon the motion for at least seventy days after the last publication of notice, and reserves the Division's right to withdraw our consent at any time until the decree is modified or terminated. The Division also

- 9 -

files a memorandum with the court explaining why we have
consented to the motion, and issues a press release similar
to the notice published by the defendant(s). Thereafter, we
file with the court copies of all comments that we receive.
If the comments persuade us that our consent was in error,
we will withdraw it. Otherwise, we may or may not file a
response to the comments, depending upon their nature.

The essential thrust of our Judgment Review Project is
to make the Division's judgment enforcement consistent with,
and an integral part of, our basic mission of promoting "free
and unfettered competition as the rule of trade." The
enforcement of decrees that unnecessarily restrain competition
violates this mission and is patently undesirable. By ter-
minating such decrees, and separating the wheat from the
chaff among the others, we will be able to concentrate our
efforts upon enforcing those decrees that truly promote
competition.

Thank you very much.

- 10 -

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that true and accurate copies of the signed <u>Stipulation in</u>

<u>Civ. No. 58-C-1158;</u>  <u>Stipulation in Civ. No. 58-C-1159 and Exhibits A-D</u> and the <u>Memorandum of</u>

<u>the United States in Response to the Motion to Terminate the 1959 Final Judgment and the 1961</u>

<u>Final Judgment</u> were served upon counsel for each defendant listed below by Federal Express this

_2/st_ day of April 2008.

**For Defendant True Temper Sports, Inc.**
Robert E. Hauberg, Jr.
John G. Calender
Phillip C. Zane, Illinois Bar No. 6208254
Baker Donelson, Bearman, Caldwell & Berkowitz, P.C.
555 Eleventh Street, N.W., Sixth Floor
Washington, D.C. 20004

**For Defendant Wilson Athletic Good Mfg. Co., Inc.**
Ray Berens, Esq.
Andre Pabarue, Esq.
Amer Sports North America
8750 W. Bryn Mawr Ave.
Chicago, IL 60631

**For Defendant Russell Corp.**
(Owner of certain marks once owned by A.G. Spalding & Bros., Inc.)
Clay Humphries, Esq.
Russell Corp.
755 Lee Street
Alexander City, AL 35010

**For Defendant MacGregor Sport Products, Inc.**
Michael Robbins
COO, MacGregor Golf
MacGregor Sport Products, Inc.
1000 Pecan Grove Dr.
Albany, GA 31710

**For Defendant Hillerich & Bradsby Co.**
Steven H. Lyverse, Esq.
Hillerich & Bradsby Co., Inc.
800 West Main St.
Louisville, KY 40232-5700

Rosemary Simota Thompson, Attorney
U.S. Department of Justice
Antitrust Division